[Civ. No. 34083. First Dist., Div. Four. Oct. 2, 1974.]

KELLY NILES, a Minor, etc., et al., Plaintiffs and Respondents, v.
CITY OF SAN RAFAEL et al.,
Defendants, Cross-complainants and Appellants;
MT. ZION HOSPITAL et al.,
Defendants, Cross-defendants and Appellants.

COUNSEL

Bronson, Bronson & McKinnon, E. D. Bronson, Jr., Bishop & Barry, Nelson C. Barry and George K. Hartwick for Defendants, Cross-complainants and Appellants.

Sedgwick, Detert, Moran & Arnold, Scott Conley, Crosby, Heafey, Roach & May, Hassard, Bonnington, Rogers & Huber and Chris B. Gosparich for Defendants, Cross-defendants and Appellants.

Musick, Peeler & Garrett, Joseph A. Saunders and Gary F. Overstreet as Amici Curiae on behalf of Defendants, Cross-defendants and Appellants.

Walkup, Downing & Sterns and William B. Boone for Plaintiffs and Respondents.

## OPINION

**CHRISTIAN, J.**—Suing for himself and as guardian ad litem for his minor son, Kelly Niles, David F. Niles has taken judgment in the amount of $4,025,000 against the City of San Rafael, the San Rafael City School District, Mt. Zion Hospital, and Dr. David Haskins. The judgment was entered on a jury verdict in that amount establishing defendants' liability for injuries which have totally and permanently incapacitated Kelly Niles. On the two public entities' cross-complaint for indemnity it was determined that they should bear $25,000 of the award; the remaining $4,000,000 was assessed against the medical defendants.

The medical defendants have paid $2,000,000 in partial satisfaction of the judgment, and attorneys' fees were fixed on the basis of that payment,

the court reserving jurisdiction to determine additional fees upon subsequent payments on the judgment. The public entities and the medical defendants have all appealed, but only the medical defendants (hereinafter "appellants") persist in attacking the judgment.

The facts necessary to consideration of the damage and indemnity issues are summarized. On June 26, 1970, 11-year-old Kelly Niles was playing softball at a school playground in a recreation program operated jointly by the City of San Rafael and the San Rafael City School District. The game was being supervised by an employee of the city's park and recreation department. During the game a fist fight broke out between Kelly and another player over who was next at bat. The supervisor, who was inside the school building when the fight began, ran back to the playground when he learned of the fight and separated the two boys. Kelly had been hit in the head and was bleeding slightly from his lip. The supervisor tried to talk to the two boys, but Kelly ran to his bicycle and rode home; he was crying and appeared hurt and upset.

Kelly sustained in the fight a small fracture of the skull which tore an artery under the fracture. The resulting bleeding between the dura and the skull caused an accumulation of clotted blood that caused severe pressure on the brain; if untreated, this type of injury results in death.

Kelly arrived home from the playground at about 4:15 p.m., but his mother was away; his father (hereinafter "Niles") arrived about 5. Niles saw that Kelly had been crying but Kelly would not explain why. The other participant in the fight, who arrived shortly after Niles, explained to Niles what had happened. Then Niles, who was divorced from Kelly's mother, drove Kelly to his apartment in San Francisco where Kelly was to spend the weekend. Kelly had cried throughout the trip from San Rafael to San Francisco and was in great distress on arrival at the apartment. Niles therefore took Kelly to the emergency room at Mt. Zion Hospital.

When Kelly arrived at the emergency room at approximately 5:45 p.m., he was examined by two nurses, an intern physician, and a pediatric resident. On the basis of his observations, the intern concluded that Kelly should be admitted to the hospital for observation of a head injury. The nurses and the resident physician agreed; the resident physician—who was the intern's supervisor—marked Kelly's chart "Admit."

The emergency room personnel had observed several signs suggesting that Kelly had suffered a head injury and that there was intracranial bleeding. Common symptoms of that type of injury include the following:

(a) A history of trauma to the head;

(b) A bruise, bump or welt on the head;

(c) Headache;

(d) Pallor;

(e) Perspiring;

(f) Repeated or forceful vomiting;

(g) Irritability and a desire to be left alone;

(h) Lethargy, grogginess, and lack of responsiveness;

(i) Slowing of pulse and rising of blood pressure;

(j) Stumbling gait and stiffening of limbs;

(k) Purposeless movement of limbs; and

(l) Dilation of pupils of the eyes.

The emergency room personnel knew that Kelly had been hit on the head; a large bump was readily apparent on Kelly's right temple; X-rays showed swollen tissue but failed to indicate a skull fracture. Kelly complained of a headache and said that he did not want to answer questions; he appeared irritable and lethargic and wanted to be left alone. Kelly became sleepier and more unresponsive; the intern wrote on his chart, "Patient extremely groggy." Kelly was pale and perspiring and vomited forcefully twice while he was in the emergency room. Kelly's pulse had been recorded at 62 when he was first examined, but it was noted on Kelly's chart that his pulse had dropped to 48. (A normal pulse rate for an 11-year-old child varies between 60 and 100.)

After the resident had concurred in the intern's recommendation that Kelly be admitted to the hospital, someone in the admitting office incorrectly told the intern that Kelly could not be admitted because he was not being treated by a private physician enjoying staff privileges at the hospital.

Dr. Haskins, director of the pediatric out-patient clinic at Mt. Zion Hospital, was in the emergency room attending another patient; the resident sought his help in getting Kelly admitted to the hospital. After questioning the intern and the resident, Haskins talked with Kelly's father to determine whether he seemed capable of observing Kelly if hospital admission were refused. Haskins talked to Kelly in the emergency room, but he did not examine Kelly or look at his chart. Then Haskins talked to Kelly's father, concluded he was a responsible person, and told him Kelly could go home. Haskins advised Niles to watch for dilation of the pupils in Kelly's eyes, and to be sure that Kelly could be aroused from sleep.

When a child with a possible head injury is released from the emergency room, it is the usual practice of the hospital to give the parent a sheet list-

ing symptoms that call for return of the child to the hospital. The head injury sheet used in the emergency room of Mt. Zion Hospital listed seven symptoms, five of which were present when Kelly was released from the hospital.[1] The sheet was not given to Kelly's father.

At approximately 7 p.m., Niles took Kelly back to his apartment. Niles continued to observe Kelly for about an hour and a half, and learned from a first aid book that a slowing pulse rate is indicative of bleeding within the skull. When Kelly's pulse rate fell from 44 to 40 within a period of five minutes, and one pupil dilated, Niles rushed him back to the emergency room at Mt. Zion Hospital at approximately 8:30 p.m.

It was then determined that Kelly had intracranial bleeding; a neurosurgeon was called and Kelly was prepared for surgery. The neurosurgeon was delayed in traffic and surgery did not begin until some time between 9:20 and 9:50 p.m. A blood clot was removed and the bleeding was stopped.

There was some doubt during the first few days following surgery that Kelly would survive; he remained in a coma for 46 days before gradually regaining consciousness. He is now totally disabled: except for slight movements of the right hand and foot, he is paralyzed from the neck down. Kelly is mute although he communicates by eye movements; he hears and sees well. Although his body is paralyzed, Kelly's mental capacities appear to be unaffected by his accident. He responds well to special education. Kelly's condition can never be improved by medical or surgical treatment; the brain damage is irreparable.

Appellants make two principal arguments against the propriety of the judgment on the cross-complaint: (1) indemnity is improper because both tortfeasors were actively negligent in causing a single injury; and (2) improper procedure was employed in reaching the judgment on the cross-complaint.

█ The public entities were awarded judgment on the cross-complaint on the basis of the equitable indemnity doctrine propounded in *Herrero* v.

---

[1] The head injury sheet stated in part:
"HEAD INJURY INSTRUCTIONS.
"Check the child every two hours after the injury until it is feeling and eating well.
"Bring the child back to the emergency room *immediately* if there is:
"1) A *large, soft lump* on the head.
"2) Unusual *drowsiness* (can't be awakened).
"3) Forceful or repeated *vomiting*.
"4) A fit or convulsion (jerking or spells).
"5) *Clumsy walking*.
"6) Bad *headache*.
"7) One *pupil larger* than the other." (Italics in original.)

*Atkinson* (1964) 227 Cal.App.2d 69 [38 Cal.Rptr. 490, 8 A.L.R.3d 629]. In *Herrero*, Alice Lorenzo was injured in an automobile accident by a vehicle driven by Herrero. About 18 months after her injury, Lorenzo underwent an operation made necessary by the automobile accident; she died in surgery. Her estate then commenced a wrongful death action naming Herrero, a hospital and three doctors as defendants, alleging that Lorenzo's death was caused by a blood transfusion negligently administered by the medical defendants. Herrero cross-complained for indemnity against the medical defendants alleging that his liability for wrongful death attached only by reason of the negligence of the doctors and the hospital. The appellate court held that Herrero had stated a cause of action for indemnity, reasoning as follows: "Although the original negligence of Herrero may be regarded in law as a proximate cause of the damages flowing from the subsequent malpractice of the cross-defendants, and the plaintiff may recover a joint and several judgment against all who are found liable, there is no reason why the ultimate burden of damages should not be distributed among the various defendants, and each be made to bear that portion of the judgment which in equity and good conscience should be borne by him. Here, Herrero has had no part in the selection of any of the cross-defendant doctors or hospital. Nothing appears to indicate that he was even aware of the decedent's decision to submit to surgery. He has had no control or direction over the conduct of the cross-defendants and not the slightest opportunity to protect himself against their negligence, yet he is made liable in law for any damages caused by them. Under such circumstances it is equitable and just that indemnity be allowed Herrero, and that the cross-defendant doctors and hospital bear that portion of the damages caused by their own negligent conduct." (*Id.,* p. 75.)

It is often said that indemnity is only available to a tortfeasor who was "passively" or "secondarily" negligent (E.g., *General Electric Co.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1973) 32 Cal.App.3d 918, 922-923 [108 Cal.Rptr. 543].) Thus, a principal who is liable to a plaintiff because his agent was negligent is entitled to be indemnified by the agent. (*Cahill Bros., Inc.* v. *Clementina Co.* (1962) 208 Cal.App.2d 367, 388 [25 Cal. Rptr. 301].) Herrero, of course, was an active tortfeasor; he injured Lorenzo with his automobile. But Herrero did not actively participate in the injury caused by the doctors and the hospital. With respect to their conduct, Herrero was liable only by virtue of the rules of *Ash* v. *Mortensen* (1944) 24 Cal.2d 654 [150 P.2d 876].[2] (See *Progressive Trans. Co.* v. *Southern*

---

[2] "It is settled that where one who has suffered personal injuries by reason of the tortious act of another exercises due care in securing the services of a doctor and his injuries are aggravated by the negligence of such doctor, the law regards the

*California Gas Co.* (1966) 241 Cal.App.2d 738, 742 [51 Cal.Rptr. 116] [Herrero was liable because of "a unique rule of causation more analogous to imputed negligence than joint feasance"].) As a passive tortfeasor, Herrero was entitled to indemnity for the damages caused by the other defendants. (Also see *Standard Oil Co.* v. *Oil, Chemical etc. Internat. Union* (1972) 23 Cal.App.3d 585, 590 [100 Cal.Rptr. 354].)

Here, as in *Herrero,* there were two distinct acts of negligence. The public entities had no control over appellants' conduct, and the public entities' liability to respondents arises out of the rule of *Ash* v. *Mortensen.* Both the public entities and appellants were active tortfeasors. The public entities were actively negligent in failing to provide proper supervision at the school playground. Appellants were actively negligent in treating Kelly improperly when he arrived at the hospital. Appellants did not merely fail to attend to Kelly; they actively caused injury to him. Haskins sent Kelly home and told his father that the boy would be all right by morning; he gave Niles incomplete instructions about watching Kelly's condition, and failed to give him the sheet of written instructions. Niles' reliance on the advice he received at the hospital caused delay in seeking proper medical attention. Appellants' negligent acts were separate and distinct from the public entities' neglect.

Appellants emphasize that without medical treatment, the outcome of the injury to Kelly's head would have been death; hence, it is argued that there was only one injury and that appellants and the public entities are joint tortfeasors with respect to that injury. But whether there was one injury or two, there were two separate torts; hence, *Herrero* applies.

The jury determined that the negligent acts of appellants and the public entities caused separate and identifiable damages; the evidence supports that determination. There was expert testimony that Kelly had an excellent chance of complete recovery if he had been properly treated when he first arrived at the hospital, and that Kelly's condition did not deteriorate to the point of permanent disability until after Kelly had been sent away and had spent some time at his father's apartment.

Appellants contend that neither the court nor the jury properly considered the issues raised by the cross-complaint. Because the indemnity issues were factual it is argued that they should have been submitted to the jury under proper instructions instead of being decided by the court. Indemnity

act of the original wrongdoer as a proximate cause of the damages flowing from the subsequent negligent medical treatment and holds him liable therefor." (24 Cal.2d at p. 657.)

usually depends on the resolution of a factual question, such as whether a tortfeasor's negligence was active or passive. (See *Burlingame Motor Co. v. Peninsula Activities, Inc.* (1971) 15 Cal.App.3d 656, 660-662 [93 Cal. Rptr. 376].) Therefore, the trial court acted correctly in submitting the issue of indemnity to the jury. (*Ralke Co. v. Esquire Bldg. Maintenance Co.* (1966) 246 Cal.App.2d 141, 144-145 [54 Cal.Rptr. 556].) The rule of *Herrero* applies if there were separate and distinct negligent acts, the original tortfeasor had no control over the second negligent act, and the liability of the original tortfeasor for the second act is imputed by law. (*Standard Oil Co. v. Oil, Chemical etc. Internat. Union, supra,* 23 Cal.App.3d at p. 590.) Since *Herrero* allows indemnification for only the damage caused by the second negligent act, a determination must be made of the damages caused by the later act. (*Herrero v. Atkinson, supra,* 227 Cal.App.2d at p. 77.) The jury returned a unanimous special verdict, apportioning liability. (Cf. *Burlingame Motor Co. v. Peninsula Activities, Inc., supra,* 15 Cal.App.3d at p. 661.)

The general verdict in favor of respondents determined that appellants and the public entities were negligent. The special verdict determining the amount of damages caused by the two groups of defendants indicated that the jury considered the two torts to be separate and distinct. That determination, and the court's consistent action in awarding judgment on the cross-complaint, are well supported by the evidence. ■ Moreover, appellants waived any defects in the form of verdict and in the procedures used in connection with the cross-complaint. Subject to their objection to the denial of their motion for nonsuit, appellants agreed to the form of the special verdict and to the methods used in adjudicating the indemnity issues. Appellants cannot be heard to complain about these matters for the first time on appeal. (*Lynch v. Birdwell* (1955) 44 Cal.2d 839, 851 [285 P.2d 919].)

■ The court's instructions to the jury were correct and sufficient. The court instructed that the public entities were liable to the plaintiff for all damages flowing from the initial tort, including damages caused by malpractice, and that appellants were liable only for damages caused by their own neglect. The court properly defined proximate cause and directed the jury not to compare the negligence of the defendants. With respect to the special verdict, it was correctly explained that the jurors should determine the damages proximately caused by appellants and by the public entities; the court explained that those damages were the ones "caused by the reasonable and probable consequence of their own negligent conduct." These instructions were adequate to explain the issues and concepts necessary to deal with the special verdict.

Appellants attack the judgment of $4,025,000 as excessive, and urge this court to reduce the award or order a new trial on the issue of damages. It is contended that the discount rate used by respondents' expert witness is too low and the rates of inflation too high, that the testimony of respondents' expert witness does not support the verdict, that the projected cost of attendant care is excessive, that the award for pain and suffering is too high, that the fees awarded to plaintiffs' counsel are excessive, and that respondents should be required to purchase an annuity contract instead of obtaining a lump sum award.

■ The determination of damages is primarily a factual matter on which the inevitable wide differences of opinion do not call for the intervention of appellate courts. (*Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506, 508 [15 Cal.Rptr. 161, 364 P.2d 337].) An appellate court, in reviewing the amount of damages, must determine every conflict in the evidence in respondent's favor and give him the benefit of every reasonable inference. (*Id.,* p. 508.) An appellate court may not interfere with an award unless "the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Id.,* p. 507.)

Respondents point to evidence supporting the following composition of the verdict:

| | |
|---|---:|
| Lost earnings | $503,570. |
| Past medical expenses | 86,240. |
| Future medical expenses | 196,902. |
| Cost of medical supplies and equipment | 41,637. |
| Medical emergency fund | 50,000. |
| Tutoring and instruction | 242,643. |
| Attendant care | 1,299,637. |
| Total economic loss | $2,420,629. |
| General damages | 1,604,371. |
| Total | $4,025,000. |

The future expenses were reduced to a present value by using a 5 percent discount rate.

■ Substantial evidence supports the damages awarded for Kelly's total economic loss. Kelly's life expectancy of approximately 69.6 years is, according to the evidence, unaffected or, at the most, decreased by 10

percent as a result of the accident if Kelly receives proper medical care. The discounted present value of his lost future earnings from age 18 to age 65, based on a study on national average lifetime income made by the United States Department of Labor, is $503,570. As stipulated by the parties, the medical and related expenses incurred to the time of trial were $86,240.

The discounted cost of $196,902 for future medical care is derived as follows: Monthly visits to a pediatrician or general family physician and yearly visits to an orthopedist for examinations would cost $350 per year. Two visits per year to a physiatrist and one annual visit to a urologist would be $100 per year, wle four visits to a psychiatrist each year would cost $200 per year. Regular physical therapy costs $60 per week, dental care necessary to correct overgrowth of the gums caused by drugs used to control epilepsy costs $100 per year, and regular medical tests and X-rays cost $245 per year. The total cost for the expected 56 years remaining in Kelly's life was derived by using an increase factor of 6 percent for physicians' services and 4½ percent for laboratory tests and X-rays, discounted by 5 percent.

Medical supplies and equipment cost a total of $41,637. The supplies include drugs and vitamins; the equipment includes lumbar corset, leg braces, electric wheelchair, hospital bed, waterbed, quadriplegic gurney for showering, hydraulic lift, and a van for transportation. A 2½ percent increase factor for special equipment and a 1 percent increase factor for transportation equipment were used in deriving the total; no inflation rate was used for medical supplies.

The total economic loss includes $50,000 for a fund to protect Kelly against medical emergencies, such as bladder and skin infections, broken bones, and clogging of blood vessels. It also includes $242,643 for tutoring and special instruction, which is necessary to provide the mental stimulation that is essential to Kelly's life. The cost of tutoring is derived as follows: the present rate is $10 per hour; the total cost assumes 2 hours' tutoring a day, 5 days a week, and an increase factor of 5½ percent.

The largest expense is $1,299,637 provided for attendant care. Kelly needs attendants to care for him constantly. At the time of trial, three attendants were employed to care for Kelly; they lived with Kelly and were provided room and board plus a wage of $400 per month. The attendants' expenses for workmen's compensation and social security were not being paid. The total cost for attendant care was derived as follows: The present annual cost for one attendant is $10,175 based on $2.50 per hour; this cost

includes his wage, social security, workmen's compensation, and other fringe benefits. Board is provided at $3 per day and room at $100 per month. Attendants' lodging was estimated to increase at a 5 percent rate, whereas wages were estimated to increase at a 5½ percent rate; again a 5 percent discount rate was used. The total was determined for two attendants until Kelly leaves school at age 18 and three thereafter for the rest of his expected life.

Appellants assert that the amount allocated for attendant care is excessive because an increase rate of 5½ percent was used in calculating the total cost; they also claim that the expert testimony presented by respondents on this rate is not substantial evidence because the expert's testimony was based on widely held knowledge common to a layman. But it was for the jury to assess the evidence, including the expert testimony. We are not able to say that any of the economic data presented to the jury were incorrect.

Anticipated future increases of medical costs may be presented to the jury. (*Burke* v. *City & County of San Francisco* (1952) 111 Cal.App.2d 314, 320 [244 P.2d 708].) Expert testimony may be used with regard to a "subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; . . ." (Evid. Code, § 801.) Future medical expenses are such a subject. (Cf. *Sooy* v. *Kunde* (1947) 80 Cal.App.2d 347, 354-356 [181 P.2d 758] [expert testimony used to show value of land].) Testimony by actuaries is frequently used to show discount rates and the present value of future benefits. (E.g., *Emery* v. *Southern Cal. Gas Co.* (1946) 72 Cal.App.2d 821, 824-826 [165 P.2d 695].)

The expert testimony was substantial evidence supporting the portion of the award relating to the future cost of attendant care. The substantial evidence test is applied in view of the entire record; other than a vigorous cross-examination of plaintiffs' expert, appellants presented no evidence on the cost of attendant care. The elaborate economic arguments presented in the briefs of appellants and amicus curiae might better have been presented to the jury in opposition to respondents' expert testimony.

Appellants claim that the 5 percent discount rate presented by the expert was too low. A discount rate, similar to an interest rate, is used to determine the present value of future expenses. The expert, in arriving at a 5 percent rate, used commercial investment studies pertaining to the riskiness of corporate bonds, charts compiled by the Federal Reserve

System showing interest yields on various bonds since 1920, and tables published by the United States Savings and Loan League showing interest rates on savings accounts since 1929. He took into account the need for reasonable security of investment over the period of Kelly's life. All of this was apparently within the competence of the expert.

■ Appellants assert that the general damages awarded by the jury are excessive. There is evidence supporting respondents' theory that $1,604,371 was awarded for general damages. General damages are awarded as compensation "not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal." (*Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892-893 [103 Cal.Rptr. 856, 500 P.2d 880].) Although these terms translate into monetary loss with great difficulty, the issue is primarily for the jury to resolve. (*Id.*, p. 893.) Frequently, mental suffering constitutes the principal element of tort damages. (*Ibid.* See generally Werchick, *Unmeasurable Damages and a Yardstick* (1965) 17 Hastings L.J. 263 [bibliography at pp. 299-300].)

Kelly's mental and emotional capacities are intact while his body is useless; this situation is predicted by life expectancy to continue for 59 years from the time of trial. The boy has suffered dire grief and anxiety— unhappy feelings that will perhaps recur again and again. Considering Kelly's condition, we cannot say that the general damages are excessive.

■ Because Kelly is a minor, payment of attorneys' fees must be approved by the trial court. (Prob. Code, § 1510.) After appellants' payment of $2,151,954.42, the court approved payment of $508,075.91 as attorneys' fees for respondents' counsel; this is 25 percent of Kelly's net recovery to the present. The court retained jurisdiction to determine attorneys' fees upon further payments on the judgment. Appellants claim that the award is excessive. But appellants do not have standing to contest the amount of attorneys' fees. If the amount of attorneys' fees were decreased, respondents would receive more money but appellants would not pay less. (Cf. *Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 12 [84 Cal.Rptr. 173, 465 P.2d 61].) A party who is not aggrieved by an order or judgment has no standing to attack it on appeal. (*Garrado* v. *Collins* (1955) 136 Cal.App.2d 323, 326 [288 P.2d 620].) Since the amount of attorneys' fees does not affect appellants' interest,

they cannot contest the amount on appeal. (See *Gelfand, Greer, Popko & Miller* v. *Shivener* (1973) 30 Cal.App.3d 364, 376 [105 Cal.Rptr. 445].)

Affirmed.

Rattigan, Acting P. J.,* and Bray, J.,† concurred.

The petition of appellants Mt. Zion Hospital and Haskins for a hearing by the Supreme Court was denied December 26, 1974. Tobriner, J., did not participate therein.

---

*Assigned by the Chairman of the Judicial Council.

†Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.