390 A.2d 765

Sandra EMBREY, Executrix of the Estate of John
M. Embrey, Deceased,

v.

BOROUGH OF WEST MIFFLIN, a Municipal
Corporation, Appellant at No. 416,

Traffic Control and Engineering Co., and Andrew J. Brown

v.

ECONOLITE CORPORATION, a Corporation and Anna
Marie Schnur.

Sandra EMBREY, Executrix of the Estate of John
M. Embrey, Deceased,

v.

HOMESTEAD HOSPITAL, Appellant at Nos. 344 and 403.

Appeal of TRAFFIC CONTROL AND ENGINEERING
COMPANY, INC., at No. 410.

Superior Court of Pennsylvania.

Argued Nov. 20, 1975.

Decided July 12, 1978.

170

Wilbur McCoy Otto, Pittsburgh, for appellant, at Nos. 344 and 403.

Ronald H. Heck, Pittsburgh, for appellant, at No. 410.

Jan C. Swensen, Pittsburgh, for appellant, at No. 416.

Vincent J. Grogan and John E. Kunz, Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

VAN der VOORT, Judge:

The issue on this appeal is the correct apportionment of an award of damages between two groups of defendants, those responsible for a highway accident and those responsible for the medical and hospital malpractice which followed.

The litigation grows out of a collision on April 20, 1972, between two cars at the intersection of Route 885 and Lewis Run Road in the Borough of West Mifflin, one driven by John M. Embrey on Lewis Run Road and the other by Anna Marie Schnur on Route 885. The evidence established to the jury's satisfaction that at the moment the cars reached the intersection the traffic control signal simultaneously showed a green light for travel on both roads. The automobiles collided and Embrey suffered personal injuries consisting of

seven fractured ribs, fractures of three lumbar vertebra and a laceration of the spleen. He was taken to Homestead Hospital where he was placed under the care of Dr. Andrew J. Brown, a physician on hospital duty at the time. Five days later Embrey died of pulmonary edema.

Sandra Embrey, widow of the decedent, as executrix of his estate and on behalf of herself and her two minor children, brought suit under both the Survival Act and the Wrongful Death Act against the Borough of West Mifflin; Traffic Control and Engineering Company (hereinafter, Traffic Control), which had installed the malfunctioning traffic signal and serviced it for the Borough; and Dr. Brown, on the averment that the medical care which he afforded the decedent was negligently administered. Traffic Control joined Econolite Corporation, from which it had purchased the signal equipment, as an additional defendant on the contention that the equipment was defective. Mrs. Embrey also filed a separate suit against Homestead Hospital on the claim that its services had been rendered negligently. The hospital joined Anna Marie Schnur, driver of the second car, as an additional defendant. Numerous claims for indemnity were filed between the various defendants.

The two lawsuits were consolidated and tried to a jury over a period of fifteen days. Because of the complexity of the litigation due to multiple theories of liability against six different defendants and the cross claims which were filed between them, the case was submitted to the jury on special interrogatories. The framing of these questions was discussed with counsel for all parties.

The interrogatories and the jury's answers were as follows:

*Interrogatory No. 1(a)*: Was there a malfunction of the traffic signal at Lewis Run Road and Route 885 at the time of the accident?

Answer: Yes.

*1(b)*: If so, was the malfunction a proximate cause of the accident?

Answer: Yes.

*Interrogatory No. 2* : If the answer to 1(a) is "Yes", was the malfunction the result of: (a) failure to maintain the equipment properly; (b) a defect in the equipment at the time of sale making it unreasonably dangerous; (c) both of the above; or (d) none of the above.

Answer: Failure to maintain the equipment properly.

*Interrogatory No. 3* : If your answer to either 2(a) or 2(c) is "Yes", whose negligence was responsible for the failure to maintain the traffic signal? (a) the Borough of West Mifflin; (b) Traffic Control and Engineering Company; or (c) both of the above.

Answer: The Borough of West Mifflin and Traffic Control and Engineering Company.

*Interrogatory No. 4(a)* : Did John Embrey assume the risk?

Answer: No.

*Interrogatory No. 5(a)* : Was John Embrey contributorily negligent?

Answer: No.

*Interrogatory No. 6(a)* : Was Anna Marie Schnur negligent?

Answer: No.

*Interrogatory No. 7(a)* : Was Dr. Andrew J. Brown negligent?

Answer: Yes.

*(b)* : If so, was his negligence a proximate cause of any injuries or damages? .

Answer: Yes.

*Interrogatory No. 8(a)* : Was Homestead Hospital negligent?

Answer: Yes.

*(b)* : If so, was its negligence a proximate cause of any injuries or damages?

Answer: Yes.

*Interrogatory No. 9* : If you find it to be appropriate under the Charge of the Court, set forth below the total

amount of damages which you find in favor of the plaintiff, under (a) the survival action.

Answer: $31,500.

*(b)*: The wrongful death action.

Answer: $621,500.

*Interrogatory No. 10*: With respect to the above damages, do you find there to be a reasonable basis for the apportionment of these damages?

Answer: Yes.

*Interrogatory No. 11*: If your answer to 10 is "Yes", what portion of the damages set forth under the survival action (See Answer 9–a) is attributable to the injuries as sustained as a result of (a) the automobile accident?

Answer: $5,000.

*(b)*: The medical malpractice?

Answer: $26,500.

*Interrogatory No. 12*: If your answer to 10 is "Yes", what portion of the damages set forth under the wrongful death action (See Answer 9–b) is attributable to the injuries sustained as a result of (a) the automobile accident?

Answer: Zero.

*(b)*: The medical malpractice?

Answer: $621,500.

On the basis of the jury's findings, the court molded a verdict in favor of Sandra Embrey in the survival action against the Borough and Traffic Control, jointly, in the amount of $5,000 and against Dr. Brown and the hospital, jointly, in the amount of $26,500. It molded a verdict against Dr. Brown and the hospital, jointly, in the wrongful death action in the amount of $621,000. The court entered verdicts exonerating Anna Marie Schnur and Econolite. The jury was polled and approved all the verdicts.

Various motions for a new trial, for judgment n.o.v. and to strike the molded verdicts were filed in the trial court. Subsequent to the argument of the post-trial motions, but before decision on them, Mrs. Embrey entered into a settle-

ment with the hospital and Dr. Brown by the terms of which she received $487,500 and agreed to settle and discontinue her actions against all parties, leaving to the defendants the issues of apportionment, contribution and indemnity. The trial court approved the settlement and signed an order for distribution of the sum realized by the settlement between Mrs. Embrey and her minor daughters. The settlement had the effect of rendering moot before the court en banc all allegations of trial error other than those involving the apportionment of damages between those responsible for the traffic accident and the medical malpractice defendants. On January 8, 1975, the court en banc sustained the verdicts molded by the trial court on the basis of the special findings of the jury and entered judgment accordingly.

Homestead Hospital appeals that ruling on the contention that the judgment against the hospital and Dr. Brown (hereinafter, the medical defendants) should have been a joint one against the Borough and Traffic Control (hereinafter, the auto accident defendants) as well, and each group of defendants made responsible for half the judgment. The hospital grounds its position on Section 457 of the Restatement of Torts, Second, which summarizes well established decisional law as follows:

"If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third parties in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or negligent manner."

Pennsylvania case law supports the Restatement: *Thompson v. Fox*, 326 Pa. 209, 212, 192 A. 107 (1937).

While the trial court accepted the law as stated in Section 457 and charged the jury as to its applicability, it also instructed the jury that if the facts as it found them to be gave it a reasonable basis for determining the respective contributions of the auto accident and the ensuing hospital and medical care to Mr. Embrey's injury and death, it might appropriately apportion damages between the auto accident

defendants and the medical defendants. The law to this effect is summarized in Section 433A of the Restatement of Torts, Second, in subsection (1)(b) as follows:

"(1) Damages for harm are to be apportioned among two or more causes where . . .

"(b) there is a reasonable basis for determining the contribution of each cause to a single harm."

The respective roles of court and jury in an apportionment of damages between defendants is summarized in Section 434, subsections (1)(b) and (2)(a) and (b) of the same Restatement as follows:

"(1) It is the function of the court to determine

. . . . .

"(b) whether the harm to the plaintiff is capable of apportionment among two or more causes; and

. . . . .

"(2) It is the function of the jury to determine, in any case in which it may reasonably differ on the issue,

"(a) whether the defendant's conduct has been a substantial factor in causing the harm to the plaintiff, and

"(b) the apportionment of the harm to two or more causes."

The court charged the jury that the auto accident defendants would be liable for any ensuing medical injury irrespective of whether such acts were done in a proper or negligent manner. It also charged that if the jury found factually that there was a reasonable basis for determining the contribution of the auto accident and the ensuing medical service to Mr. Embrey's pain and suffering and ultimate death they should apportion the award of damages between these two causes. In effect, the trial court charged, as a matter of law, that there was evidence, if believed, from which the jury could find separate causes for a single harm. In order to do so, however, the jury would have to accept the testimony of Dr. Theodore Rodman, the plaintiff's medical witness, which it obviously did. It was not for the trial court to determine the question of the credibility of Dr. Rodman's

testimony, that being a matter wholly within the province of the jury. The charge fairly reflects the separate responsibilities of court and jury. We agree with the court en banc that the circumstances of the instant case provide a textbook example of when damages should be apportioned. The decedent was injured and suffered damages as a result of the negligence of the Borough and Traffic Control. Credible evidence, however, clearly delineates the damages which were suffered as a result of that negligence and those which were suffered as a result of the medical malpractice which followed.

Prior to submission of the case to the jury, counsel for the hospital approved the use of special interrogatories as "a proper means of handling a very tough problem faced by the court". He also approved the wording of the special interrogatories. When counsel were invited to comment on the court's charge to the jury, counsel for the hospital suggested, without taking an exception, that the court, while leaving it to the jury to determine whether their findings would warrant an apportionment, had appeared to emphasize apportionment. However, counsel approved leaving the matter in the hands of the jury, stating: "Of course, really, it's their question whether they do or they don't [apportion]. They have two opposing principles." Counsel for the hospital having agreed at the trial that the issue of apportionment was properly left to the jury, the hospital cannot contend on appeal that the court should have issued binding instructions on the issue: *Dilliplaine v. Lehigh Valley Trust Company*, 457 Pa. 255, 257–260, 322 A.2d 114 (1974); Rule 302 of the Rules of Appellate Procedure.

The jury was abundantly justified in finding that the medical defendants were solely responsible for Mr. Embrey's death and largely responsible for the pain and suffering which he experienced prior to death. These conclusions find adequate support in the testimony of Dr. Theodore Rodman, a well qualified medical expert in the field of chest injuries. He testified that the decedent had not suffered any life threatening injuries in the auto accident and that with

proper medical care he might have been out of the hospital in a few weeks and back on his job as manager of a branch office of Mellon Bank within three months. He testified that the decedent was suffering from a grossly unstable or "flail" chest. Mr. Embrey's rib cage had seven fractured ribs on the left side, making breathing extremely painful and, in the process, destabilizing to the rib cage. In Dr. Rodman's opinion, a patient in the condition of the decedent should have been intubated so that his rib cage could have been stabilized and the extreme pain caused by his efforts to breathe alleviated. This would have involved inserting a tube into the windpipe through the nose or mouth in order to put the patient on a volume cycled ventilator. Such a ventilator takes over the breathing for the patient and spares him having to generate negative pressures on his ribs by contracting his respiratory muscles. Instead of the patient pulling air in, the ventilator pushes it in. The bony fragments of the ribs are prevented from moving, pain is relieved and the healing process begins when the bony parts of the ribs are immobilized. When sufficient healing of the fractured ribs had occurred, the intubation and artificial breathing could have been discontinued and the patient would have made a normal recovery.

The medical defendants did not diagnose the rib cage as being in an unstable or "flail" condition. Instead of being intubated the patient was given repeated doses of pain suppressing drugs which had the additional effect of suppressing the respiratory centers of the brain and exacerbating an already serious problem. Oxygen was administered but no effort made to stabilize the rib cage.

Dr. Rodman testified that the attending nurses should have called for medical help in the late afternoon of the day before Mr. Embrey died. The nurses notes, recorded between 4:00 and 5:00 P.M., indicated that the patient's chest was congested and wheezy, his respiration slow and rapid. He was instructed to deep breathe but said it was too painful. The patient was cyanotic and talked aloud to himself. Dr. Rodman stated that these symptoms indicated that the patient had a grossly inadequate supply of oxygen

and that the brain was suffering from a lack of oxygen. In the doctor's opinion, the condition described in the nurses' notes "is imminently life threatening. This is a case where you just don't call for help, but you push the panic button. You have very little time left to save the patient." Dr. Rodman testified that the failure of the nursing personnel in the intensive care unit of the hospital in which the decedent was a patient to seek medical advice the afternoon before his death when the patient displayed symptoms indicating a serious crisis constituted nursing care which did not rise to the standards which one should expect in today's hospitals. By 11:00 P.M. of that day, the patient's temperature had risen, which Dr. Rodman interpreted to confirm the probability of infection. No medical help was sought, no tests were taken and no antibiotics prescribed. Dr. Rodman characterized this as "unbelievably bad medical care".

By 7:30 on the morning of his death the patient was confused, disoriented and having extreme respiratory difficulty. Dr. Brown was called at his home, but could not be reached because he was enroute to the hospital. No other doctor was called until Dr. Brown arrived some twenty or thirty minutes later. In Dr. Rodman's opinion, a doctor physically present in the hospital should have been summoned immediately. Mr. Embrey died shortly after Dr. Brown's arrival under circumstances which Dr. Rodman characterized as indicating "the grossest kind of medical mismanagement by both the physician and the hospital staff". He expressed the opinion that Mr. Embrey's life could have been saved as late as an hour before his death with proper medical attention. He characterized the medical negligence as "gross" and the consequences "obvious and catastrophic". He testified that "Probably from the moment that I saw the evaluation performed during the first hour or so of his hospitalization, I could have made that prediction [of death] with the contingency that the management that was initiated would continue unchanged."

Dr. Rodman testified that the stasis pneumonia which the decedent developed caused him to drown in the secretions of his lungs, a result that was certain to occur in view of the

method of treatment chosen. Dr. Rodman's testimony may be summarized as indicating a course of medical treatment which saw the patient suffering from painful, but not life-threatening injuries, go into an agonal state and die without having received the kind of medical treatment which is standard in this age.

It was on the basis of this testimony that the jury apportioned all of the responsibility for Mr. Embrey's death and a substantial portion of his pain and suffering on the doctor and hospital.

Despite this testimony which clearly established a factual basis for apportionment of responsibility, the hospital contends that as a matter of law the traffic accident defendants were also jointly responsible for Mr. Embrey's death because they put in motion the chain of events that led to death, even though the intervening acts of the medical defendants were negligent. It cites in support of that legal position *Thompson v. Fox, supra,* 326 Pa. 209, 192 A. 107. In *Thompson* the plaintiff was injured by an automobile driven by one Taylor and required medical treatment as a consequence. Plaintiff brought an action against Taylor for negligence and set forth all of his injuries, including those resulting from the medical care. The plaintiff later settled with Taylor and signed a formal release. Subsequently, he sued the attending doctor, alleging careless and improper treatment. The Supreme Court affirmed binding instructions for the defending doctor on the ground that the plaintiff had already been paid for his injuries in his settlement with Taylor. The court held that the liability of the original wrongdoer extended to the additional harm caused by negligent medical treatment necessitated by the original accident. The decision in *Thompson* is simply an application of Section 457 of the Restatement of Torts, Second. It is a holding that a plaintiff cannot recover twice for the same injury. Apportionment between the party who caused the accident and the doctor, both responsible, was not an issue and not discussed.

■ This Court has cited Section 433A (apportionment) with approval and applied it to joint tortfeasors in a situa-

tion involving an injury caused by successive collisions in a skidding accident: *Shamey v. State Farm Mutual Automobile Insurance Company*, 229 Pa.Super. 215, 223, 331 A.2d 498 (1974). There would appear to be no reason why apportionment should not be equally applicable between joint tortfeasors, one of whom caused an accident which sent the victim to a hospital and the other responsible for negligent medical treatment which caused death. This precise application has been made many times in other states. Rulings to this effect by the appellate courts of Arizona, California, Colorado, Florida, Illinois, New York, North Carolina, Ohio and Wisconsin are collected in an annotation in 8 A.L.R.3d 629 entitled "Right of Tortfeasor Initially Causing Injury to Recover Indemnity or Contribution from Medical Attendant Causing New Injury or Aggravating Injury in Course of Treatment".

Two of the cited decisions from California, *Herrero v. Atkinson*, 227 Cal.App.2d 69, 38 Cal.Rptr. 490 (1964), and *Niles v. City of San Rafael*, 42 Cal.App. 230, 116 Cal.Rptr. 733 (1974), are particularly illuminating in their reasoning. In *Herrero* a defendant by that name, while driving a motor vehicle, was involved in an accident with another vehicle as a result of which one Alice Lorenzo was injured. The injury necessitated an operation in the course of which Lorenzo died, allegedly because of a blood transfusion negligently administered. The administrator of the Lorenzo estate sued Herrero, the doctors and the hospital. Herrero filed a cross complaint seeking indemnity from the hospital and doctors. Each of the doctors and the hospital filed general demurrers to the cross complaint which were sustained at the trial level but that decision reversed on appeal. In sustaining Herrero's right to seek indemnity from the hospital and doctors, the Court of Appeals said (227 Cal.App.2d 69, 75, 38 Cal. Rptr. 490):

"Here, if Herrero is liable, he is liable for the damages caused by his own negligent conduct, and may be made further liable for the later alleged negligent conduct of the cross-defendant doctors and hospital. Herrero's liabil-

ity for the negligence of the doctors and hospital would arise out of a positive rule of decisional law of this state, as stated in *Ash v. Mortensen*, 24 Cal.2d 654, 657 [150 P.2d 876], where the court said: 'It is settled that where one who has suffered personal injuries by reason of the tortious act of another exercises due care in securing the services of a doctor and his injuries are aggravated by the negligence of such doctor, the law regards the act of the original wrongdoer as a proximate cause of the damages flowing from the subsequent negligent medical treatment and holds him liable therefor.' . . . Although the original negligence of Herrero may be regarded in law as a proximate cause of the damages flowing from the subsequent malpractice of the cross-defendants, and the plaintiff may recover a joint and several judgment against all who are found liable, there is no reason why the ultimate burden of damages should not be distributed among the various defendants, and each be made to bear that portion of the judgment which in equity and good conscience should be borne by him . . . Here, Herrero has had no part in the selection of any of the cross-defendant doctors or hospital. Nothing appears to indicate that he was even aware of the decedent's decision to submit to surgery. He has had no control or direction over the conduct of the cross-defendants and not the slightest opportunity to protect himself against their negligence, yet he is made liable in law for any damages caused by them. Under such circumstances it is equitable and just that indemnity be allowed Herrero, and that the cross-defendant doctors and hospital bear that portion of the damages caused by their own negligent conduct." (Underscoring added.)

In *Niles* a guardian for a minor son sued the City of San Rafael, its school district and a hospital and doctor for injuries to the minor son suffered in a playground accident and allegedly made total and permanent by the negligence of the doctor and hospital. On a cross complaint of the city and school district for indemnity, it was determined that they should bear $25,000 of an award and the remaining $4

million was assessed against the medical defendants. The court explained its ruling as follows (42 Cal.App.3d 230, 239–40, 116 Cal.Rptr. 733, 738):

"Here, as in *Herrero,* there were two distinct acts of negligence. The public entities had no control over appellants' conduct, and the public entities' liability to respondents arises out of the rule of *Ash v. Mortensen.* Both the public entities and appellants were active tortfeasors. The public entities were actively negligent in failing to provide proper supervision at the school playground. Appellants were actively negligent in treating Kelly improperly when he arrived at the hospital . . .

. . . . .

"The jury determined that the negligent acts of appellants and the public entities caused separate and identifiable damages; the evidence supports that determination. There was expert testimony that Kelly had an excellent chance of complete recovery if he had been properly treated when he first arrived at the hospital, and that Kelly's condition did not deteriorate to the point of permanent disability until after Kelly had been sent away and had spent some time at his father's apartment.

". . . the trial court acted correctly in submitting the issue of indemnity to the jury. (*Ralke Co. v. Esquire Bldg. Maintenance Co.* (1966) 246 Cal.App.2d 141, 144–145 [54 Cal.Rptr. 556].) The rule of *Herrero* applies if there were separate and distinct negligent acts, the original tortfeasor had no control over the second negligent act, and the liability of the original tortfeasor for the second act is imputed by law. (*Standard Oil Co. v. Oil, Chemical etc. Internat. Union,* supra, 23 Cal.App.3d 585, at p. 590, 100 Cal.Rptr. 354). Since *Herrero* allows indemnification for only the damage caused by the second negligent act, a determination must be made of the damages caused by the later act. (*Herrero v. Atkinson, supra,* 227 Cal.App.2d at p. 77, 38 Cal.Rptr. 490.) The jury returned a unanimous special verdict, apportioning liability. (Cf. *Burlingame Motor Co. v. Peninsula Activities, Inc., supra,* 15 Cal.App.3d 656, at p. 661, 93 Cal.Rptr. 376.)

"The general verdict in favor of respondents determined that appellants and the public entities were negligent. The special verdict determining the amount of damages caused by the two groups of defendants indicated that the jury considered the two torts to be separate and distinct. That determination, and the court's consistent action in awarding judgment on the cross-complaint, are well supported by the evidence . . .

"(3) The court's instructions to the jury were correct and sufficient. The court instructed that the public entities were liable to the plaintiff for all damages flowing from the initial tort, including damages caused by malpractice, and that appellants were liable only for damages caused by their own neglect. The court properly defined proximate cause and directed the jury not to compare the negligence of the defendants. With respect to the special verdict, it was correctly explained that the jurors should determine the damages proximately caused by appellants and by the public entities; the court explained that those damages were the ones 'caused by the reasonable and probable consequence of their own negligent conduct.' These instructions were adequate to explain the issues and concepts necessary to deal with the special verdict." (Underscoring added.)

 This reasoning applies with equal force to the case before us. As between the plaintiff and the auto accident defendants the latter are responsible to the plaintiff for the consequences of Mr. Embrey's hospitalization because, as a matter of causation, it was the accident which sent the decedent to the hospital. However, the jury accepted the testimony of Dr. Rodman that the accident would not have led to Mr. Embrey's death had it not been for negligent medical and hospital care. Consequently, as between the two groups of defendants, responsibility for the death rested on the medical defendants, as the jury found. Likewise, as between the defendants, most of the damages awarded for pain and suffering were placed on the medical defendants on the basis of the evidence that the pain and discomfort Mr.

Embrey suffered in breathing could have been greatly minimized by proper diagnosis and treatment. The evidence afforded a clear basis for the apportionment made by the jury between the auto accident defendants and the medical defendants.

The hospital is remitted to the argument that, as a matter of law, there must be equal contribution between joint tort-feasors. If that be true, there could never be apportionment between joint tortfeasors and the rule of law stated in Section 433A would be wiped out. This position finds no support in our law. Contribution, indemnity and apportionment are each procedures to approximate an equitable division of responsibility between defendants who are jointly liable to a plaintiff. Equitable principles are applied: *Ansteine v. Pennsylvania Railroad*, 352 Pa. 547, 549, 43 A.2d 109 (1945); *Mong v. Hershberger*, 200 Pa.Super. 68, 186 A.2d 427 (1962).

We find no error in the apportionment of responsibility between the auto accident and the medical defendants in this case.

Judgments affirmed.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.