551 A.2d 1059

Lucille CORBETT

v.

I. David WEISBAND, D.O. and Regional Orthopedic
Professional Association, Appellants.

Lucille CORBETT, Appellant,

v.

I. David WEISBAND, D.O., and Regional Orthopedic
Professional Associates.

Lucille CORBETT, Appellant,

v.

Jamilio DeMOURA, M.D. and St. Joseph's Hospital.

Lucille CORBETT, Appellant,

v.

Jamilio DeMOURA, M.D. and St. Joseph's Hospital.

Lucille CORBETT

v.

Jamilio DeMOURA, M.D. and St. Joseph's Hospital.

Appeal of I. David WEISBAND, D.O. and Regional
Orthopedic Professional Associates.

Superior Court of Pennsylvania.

Argued Oct. 7, 1987.

Filed Nov. 17, 1988.

Reargument Denied Jan. 5, 1989.

294

Allan Molotsky, Philadelphia, for appellants (at 00975 and 01167 Philadelphia 1987).

Lawrence D. Finney, Philadelphia, for appellant (at 01105, 01106 and 01107 Philadelphia 1987) and for appellee (at 00975 and 01167 Philadelphia 1987).

Jan E. DuBois, Philadelphia, for appellee (at 01106, 01107 and 01167 Philadelphia 1987).

Before ROWLEY, WIEAND and OLSZEWSKI, JJ.

ROWLEY, Judge:

These are five consolidated appeals and cross-appeals from judgments entered in two medical malpractice actions filed by Lucille Corbett against two doctors, a hospital, and an orthopedic association. The physicians treated her in succession: Dr. DeMoura from July through October 1978 and Dr. Weisband from December 1978 through August 1981. The plaintiff, Lucille Corbett, alleged in both actions that the defendants had been negligent in the care and treatment of a post-operative infection in her left knee, which ultimately led to the amputation of her leg in July of 1983.

## I. PROCEDURE

The first of plaintiff's actions, docketed in the trial court at 1329 January, 1981, was brought against Jamilio De-Moura, M.D. and St. Joseph's Hospital. Prior to trial, Ms. Corbett withdrew her claim against St. Joseph's Hospital,[1]

---

1. No issues have been raised by any party involving the withdrawal by plaintiff of her claim against St. Joseph's Hospital.

leaving Dr. DeMoura as the only defendant in that action. The second action, docketed at 1512 September, 1983, was brought against I. David Weisband, D.O. and Regional Orthopedic Professional Association ("ROPA").[2] The two actions were consolidated for trial. The trial, however, was bifurcated in terms of liability and damages.

At the liability trial, after the close of plaintiff's case, the trial court entered a compulsory non-suit in favor of defendant Dr. DeMoura. The trial proceeded against Dr. Weisband and ROPA. At the close of trial, on December 16, 1985, the jury retired for deliberations. The jury concluded its deliberations on December 18, 1985, and entered its verdict in favor of the plaintiff and against Dr. Weisband and ROPA.[3] The damage aspect of the case was tried the following morning, and the jury, after due deliberations, returned a verdict of $150,000 in the afternoon. Post-trial motions were filed by Ms. Corbett, and collectively by Dr. Weisband and ROPA. Subsequently, the post-trial motions of all parties were denied. Judgments were entered on the verdict and these appeals followed.

Plaintiff Corbett filed three appeals. Two (1106 and 1107 Philadelphia, 1987) are from the judgment entered against her in favor of Dr. DeMoura. Ms. Corbett's third appeal (1105 Philadelphia, 1987) is from the judgment in her favor against Dr. Weisband and ROPA.

The defendants, Dr. Weisband and ROPA, filed two appeals. One (975 Philadelphia, 1987) is from the judgment in Ms. Corbett's case against them. The other appeal (1167 Philadelphia, 1987) was taken by Dr. Weisband and ROPA from the judgment entered in favor of Dr. DeMoura in Ms. Corbett's suit against Dr. DeMoura. In that appeal appel-

2. At all times relevant to this action ROPA was a professional orthopedic corporation, of which Dr. Weisband was a shareholder. From all indications of record, any negligence attributable to Dr. Weisband is to be imputed to ROPA.

3. In addition to rendering its verdict in favor of the plaintiff and against Dr. Weisband, the jury found one Dr. Mogil to have been negligent. Dr. Mogil, not a defendant in this case, was a member of ROPA. As to the finding of negligence against Dr. Mogil, the trial court molded the verdict as being against ROPA.

lants argue that the trial court erred in denying Ms. Corbett's motion to remove the compulsory non-suit against her.

We will quash the appeal by Ms. Corbett at 1107 Philadelphia, 1987. It is identical to and, therefore, duplicative of the appeal at 1106 Philadelphia, 1987. We will also quash, for lack of standing, the appeal at 1167 Philadelphia, 1987, by Dr. Weisband and ROPA from the judgment entered upon the order refusing to remove the compulsory non-suit in favor of Dr. DeMoura. This Court has held that "[w]hen separate actions are consolidated for trial, each action retains its separate character. Each has its separate docket entries, and each produces its own verdict and judgment." *Roznowski v. Pennsylvania National Mutual Casualty Insurance Co.*, 343 Pa.Super. 7, 12, 493 A.2d 775, 777–78 (1985). Because Dr. Weisband and ROPA were not parties to the action by Ms. Corbett against Dr. DeMoura, they do not have standing to appeal the trial court's order in that case irrespective of the fact that the case was consolidated by the trial court with Ms. Corbett's suit against them.[4]

Three appeals remain. Ms. Corbett contends, in her appeal at 1106 Philadelphia, 1987, that the trial court erred in granting the compulsory non-suit against her in favor of Dr. DeMoura and requests that the case be remanded for a new trial against him.

Dr. Weisband and ROPA, in their appeal at 975 Philadelphia, 1987, contend that they are entitled to judgment n.o.v. on the ground that the statute of limitations bars Ms. Corbett's claim against them. In the alternative, they seek a new trial due to alleged trial errors.

Finally, in her appeal at 1105 Philadelphia, 1987, Ms. Corbett contends that as a result of certain erroneous trial

4. Additionally, we note that none of the issues raised by Dr. Weisband and ROPA in their brief addresses the question of whether the trial court erred in granting Dr. DeMoura's motion for a compulsory non-suit. Therefore, even if we had not quashed their appeal, for lack of standing, we would have dismissed the appeal for failure to preserve any issues for appellate review.

rulings the verdict in her favor is inadequate and her case should be remanded for a new trial against Dr. Weisband and ROPA as to damages only.

We will consider these appeals and the parties' contentions after a summary of the facts.

## II. SUMMARY OF FACTS

At the time of trial, Ms. Corbett was sixty-eight (68) years old. She had been employed as a domestic throughout her working life, and first developed knee sores while scrubbing floors in Philadelphia during the late 1930's and early 1940's. These problems recurred during the late 1950's and early 1960's. In 1969 Ms. Corbett suffered an additional injury to her knee, for which she received treatment. In October 1971, surgery was performed on her left knee to have cartilage removed. This was the first time that surgery was performed on her knee. In 1973, Ms. Corbett came under the care of Dr. DeMoura. Dr. DeMoura performed surgery on her spine in 1974 and on her right knee in 1975 or 1976. Thus, it is evident from the record that Ms. Corbett has a long history of medical problems, primarily involving her knees.

The events giving rise to these lawsuits commenced in July 1978 with the operation by Dr. DeMoura on Ms. Corbett's left knee. Following the operation, Dr. DeMoura continued to treat Ms. Corbett through October 1978. In December 1978, she came under the care of Dr. Weisband, for treatment of a knee infection. He treated her through August 1981. During that time, in October 1980, she had a left knee fusion performed by Dr. Weisband at Metropolitan Hospital. According to Dr. Greene,[5] who began treating her in September 1981, the left knee fusion was not successful. Ms. Corbett was hospitalized in December 1981 at which time Dr. Greene performed a total knee replacement on her left knee. From January 5 through 30, 1982, Ms. Corbett was readmitted to the hospital under Dr. Greene's care because the wound in front of her left knee joint had

5. The pleadings indicate that a separate law suit is pending against Dr. Greene.

opened. She was discharged once the wound began to heal. In March, Ms. Corbett again was admitted to the hospital under Dr. Greene's care because the wound had not yet healed.

Ms. Corbett was not hospitalized again until November, 1982, when she broke her left leg as she was climbing out of bed. She remained in the hospital for nine months following this admission. During this time period, in April 1983, the knee implant was removed because it had become infected. Several months later, in July 1983, Ms. Corbett's leg was amputated above the knee because it was Dr. Greene's belief that the infection would never clear. The aforementioned legal actions followed.

### III. CORBETT vs. DeMOURA

Ms. Corbett has appealed from the judgment entered by the trial court in favor of Dr. DeMoura. All of the events which are the subject of this appeal occurred between July and October, 1978.

Ms. Corbett argues that the trial court erred in granting Dr. DeMoura's motion for a compulsory non-suit which was made at the conclusion of plaintiff's liability case against Dr. DeMoura. Dr. DeMoura contends that the testimony of Ms. Corbett's expert, Dr. Starks, contained irreconcilable conflicts, and thus was not sufficient to present an issue to the jury. Ms. Corbett responds that the testimony of her expert, Dr. Starks, was not contradictory, but rather was sufficient to create a question for the jury concerning Dr. DeMoura's alleged negligence. Therefore, she argues that she is entitled to a new trial. We agree.

■ "A non-suit may not be granted unless the jury, viewing all the evidence and all reasonable inferences arising from it, in the light most favorable to the plaintiff, could not reasonably conclude that the elements of the cause of action have been established." *Mazza v. Mattiace*, 284 Pa.Super. 273, 277, 425 A.2d 809, 811–12 (1981). To establish a prima facie case of professional medical negligence, Ms. Corbett must prove by competent evidence that the

conduct of Dr. DeMoura fell "below the standards of reasonable medical practice, and that her injuries [were] caused by [his] failure to provide such medical care." *Reichman v. Wallach,* 306 Pa.Super. 177, 183, 452 A.2d 501, 504 (1982).

Before addressing the legal arguments on this issue, we must expand our summary of the facts listed above. Ms. Corbett was admitted to the hospital on July 11, 1978. Dr. DeMoura operated on her knee the following day, July 12, 1978. She was discharged on July 19th. Ms. Corbett was readmitted to the hospital on July 25, 1978, where she remained until August 26, 1978, due to a post-operative infection. She remained under Dr. DeMoura's care until October 10, 1978. Her expert witness, Dr. Starks, was critical of Dr. DeMoura's treatment on two counts: (1) that a different antibiotic should have been utilized; and (2) that debridement of the left knee should have been performed in the operating room under general anesthesia.

Dr. Starks was the only expert to testify against Dr. DeMoura. He took the witness stand and was duly qualified as an expert in orthopedic surgery. The gravamen of Dr. Starks' theory was that an enterobacter organism, existing dormant in the wound from Ms. Corbett's prior difficulties, caused her later infection. After outlining the course of treatment which Ms. Corbett received while under the care of Dr. DeMoura, Dr. Starks specifically testified that in his opinion, based upon a reasonable degree of medical certainty, the wound should have been debrided in the operating room and gentamicin should have been administered with close monitoring. This opinion was offered during the following exchange:

BY MR. FINNEY [Ms. Corbett's counsel]:

Q. Doctor, based upon all the facts in the record that we have reviewed this morning, and that appear in the chart for the St. Joseph's Hospital, do you have an opinion, *based upon a reasonable degree of medical certainty,* as to whether the medical treatment for this patient met the standard of reasonable care as it existed in 1978?

A. My opinion is that it did not.

Q. Would you please explain your opinion, sir?

A. I feel that *according to the standards of good and reasonable care*, the wound should have been debrided more widely in the operating room under an anesthetic so that all of the necrotic tissue could have been removed to normal, healthy tissue. And I believe that the gentamicin should have been administered with the blood urea nitrogen level being monitored very closely.

Trial transcript, December 9, 1985 at 39–40 (emphasis added). Further, Dr. Starks opined that the keflex prescribed by Dr. DeMoura failed to kill the enterobacter organism. He explained his position, stating:

It's my opinion that the infection that was originally treated subsided, but was not cured or eliminated and that it did lie dormant or quiescent in the tissues and was then—then again became active at the time of the Metropolitan Hospital admission, producing a recurrence of infection.

T.T., December 9, 1985 at 52. Thus, there can be no doubt that on direct examination Ms. Corbett's expert witness unequivocally stated that in his opinion, Dr. DeMoura's treatment fell below the standard of good and reasonable care.

On cross-examination, defense counsel attempted to get Dr. Starks to recant his testimony. With regard to the debridement issue, the following testimony was elicited:

[BY MR. DuBOIS, attorney for Dr. DeMoura:]

Q. Would you agree with me that it is important to debride away or to cut away all of the dead or necrosed tissue?

A. Yes, sir.

Q. And if in the judgment of the treating physician that could be done at a hospital bedside, you would have to agree with that type of treatment; would you not?

A. Yes, sir.

Q. And by the way, ... you have talked in your testimony about going to the operating room and going through a debridement under general anesthesia; is that right?

A. Yes, sir.

Q. Is it correct that there are risks associated with general anesthesia?

A. Yes, sir.

Q. Is it correct that patients *can* die as a result of general anesthesia?

A. Yes, sir.

Q. If you *can* avoid using general anesthesia in a case, Dr. Starks, will you avoid it?

A. Yes, sir.

\* \* \* \* \* \*

Q. All right. Would you agree with me that you *would try to avoid* general anesthesia in cases because it is risky and dangerous?

A. Yes, sir.

T.T., December 9, 1985 at 72–73 (emphasis added). Although Dr. Starks testified generally concerning dangers which possibly can occur in the use of general anesthesia, defense counsel did not elicit from the witness testimony that *under the facts of the case at bar,* the dangers of anesthesia outweighed the danger posed by not being able to fully debride the wound such that in this instance the treatment fell below the standards of good and reasonable care. In other words, cross-examination focused on generalities, rather than on the specifics of this case.

It was not contradictory, therefore, that on redirect testimony, Dr. Starks reiterated his position by stating that, in his opinion, the infection that was present in 1978 never went away:

[By Mr. Finney:]

Q. [D]o you have an opinion, doctor, whether the infection which is seen in December of '78 at Metropolitan, whether or not that is the same infection that we were talking about back in July and August?

\* \* \* \* \* \*

A. It's my opinion that it is the same infection.

THE COURT: Well, that means enterobacter?

THE WITNESS: Yes, sir.

T.T., December 8, 1985 at 88–89. Further, Dr. Starks explained,

> I feel that the infection that we saw in the summer of 1978 subsided, but it was not cured, and that the organisms that caused the infection remained dormant in the tissues and then were reactivated by the fall and reinjury, and therefore, you would have to say that it was the same infection that had recurred as a result of the reinjury.

T.T., December 9, 1985 at 91. Dr. Starks fully explained the reasons why the organism never went away: the wound was not fully debrided and a strong enough antibiotic was not used.

■ Upon thoroughly reviewing this testimony, we do not agree with Dr. DeMoura's contention that Dr. Starks waivered from his opinion to such an extent that it could not be relied upon to support a verdict for Ms. Corbett. However, even had he waivered, in the case of *Brannan v. Lankenau Hospital*, 490 Pa. 588, 417 A.2d 196 (1980), the Supreme Court held that a "relatively minor divergence in only a part of appellant's expert testimony, when viewed against the testimony as a whole" does not sufficiently compromise the witness' testimony on direct so as to justify the removal of the issue from jury consideration. *Id.*, 490 Pa. at 597, 417 A.2d at 200. Therefore, the trial court erred in granting the non-suit and we remand the case for a new trial against Dr. DeMoura.[6]

## IV.   CORBETT vs. WEISBAND AND ROPA

In her suit against Dr. Weisband and ROPA, Ms. Corbett focuses on two specific periods of treatment: her stay at Metropolitan Hospital under Dr. Weisband's care from December 18 through 24, 1978, and a knee fusion procedure performed by Dr. Weisband in October, 1980.

---

**6.** Ms. Corbett also argues that the trial court erred in refusing to allow her other experts, Drs. Meinhard and Spicehandler, to testify concerning the conduct of Dr. DeMoura in treating her. We need not address this argument due to our conclusion that Ms. Corbett is entitled to a new trial.

## A. *Facts*

Ms. Corbett first came under Dr. Weisband's care on December 18, 1978, when she entered the emergency room of Metropolitan Hospital. Dr. Weisband testified that he was told by the resident who had examined Ms. Corbett that she had a prior record of infection about the knee joint, that she had fallen four days prior to admission, and that there was no break in the skin at the knee. Dr. Weisband testified that, given her history, he was "concerned about a very severe underlying infection." He reviewed an X-ray and concluded that there were signs of osteomyelitis.[7] Dr. Weisband additionally testified that when he first saw Ms. Corbett on the 19th, the day following her admission, the wound was draining well and "it didn't require being opened up." He stated that the standard treatment of chronic osteomyelitis was to administer long-term antibiotics, first intravenous and then oral. He also planned to do a series of tests on Ms. Corbett. However, Dr. Weisband testified that Ms. Corbett left the hospital on December 24th because she wanted to go home for Christmas. "Osteomyelitis" was not specifically listed on the discharge diagnosis, however, and Dr. Weisband testified that this was because the necessary tests to confirm it were not performed due to Ms. Corbett's premature departure.

7. Osteomyelitis has been defined as the
[i]nflammation of a bone and its marrow, caused by infection with bacteria or other microorganisms. The microorganisms involved are usually of the pus-forming kind, as the staphylococcus or streptococcus.... Any bone may be infected, but the long bones (i.e., the bones of the limbs) are more often the site of osteomyelitis. The disease is usually acute, running a severe but limited course; sometimes, however, it lingers in a chronic form.
The onset is marked by fever, pain, chills, weakness, nausea, and vomiting. In a few days, the soft tissue (flesh) over the area of infection, which is usually near a joint, becomes red and swollen. The infection may spread to other bones, since the microorganisms in the marrow have easy access to the blood stream.
Treatment includes general care of the patient, antibiotic medicines (penicillin, etc.) and providing drainage for the pus, in some cases.
3 J.E. Schmidt, M.D., *Attorney's Dictionary of Medicine and Word Finder* 70 (1982).

The second period of treatment at issue in this dispute occurred during October 1980. Prior to such treatment, during the summer of 1980, Ms. Corbett had struck her left knee during a traffic accident. She received some initial treatment at Metropolitan Hospital, and later returned when "the infection had started back." During office visits with Dr. Mogil, a ROPA associate, in September, 1980, Ms. Corbett complained of severe pain in her knee. Dr. Mogil testified that he told her on September 4th that an arthrodesis, a knee fusion, should be performed, and that he explained the procedure to her. Ms. Corbett, however, testified that Dr. Mogil had never discussed an arthrodesis or knee fusion procedure with her. In any event, the ROPA doctors made preparations to have Ms. Corbett admitted for a knee fusion. On October 17, 1980, one Dr. Rubin admitted Ms. Corbett because of stomach and constipation problems. The ROPA group finally came "on service" on October 27, 1980, at which time the patient came under their charge. On October 31, Dr. Weisband performed the arthrodesis.

Ms. Corbett's counsel first argued at trial that although Dr. Weisband diagnosed her condition as preexisting and chronic osteomyelitis of her left knee, he failed to properly treat the condition in December 1978. Second, her counsel argued that the doctor, without her prior informed consent, negligently performed the arthrodesis on October 31, 1980. Further, counsel contended that Dr. Weisband's negligent and unauthorized conduct toward her resulted in the aggravation and exacerbation of the preexisting osteomyelitis in her left knee which, eventually, on July 13, 1983, resulted in the amputation of her left leg. Finally, Ms. Corbett's counsel asserted that she was unable to discover the existence of her injury [the aggravation and exacerbation of a preexisting osteomyelitis], the operative conduct of Dr. Weisband in failing to properly diagnose and treat the knee and then performing the fusion, and the causal relationship between the two, until September 12, 1983, when she received the information from Dr. Greene.

Both parties filed appeals and cross-appeals in this action. We address, first, the appeal of Dr. Weisband and ROPA.

B. *Appeal of Dr. Weisband and ROPA 975 Philadelphia, 1987*

1. Judgment N.O.V.

Dr. Weisband and ROPA assert that the trial court erred in not entering judgment n.o.v. in their favor because Ms. Corbett's claim was brought after the two-year statute of limitations had run. 42 Pa.C.S. § 5524. Ms. Corbett responds that under the "discovery rule," the limitations period does not begin to run until the date she learned of Dr. Weisband's injuries to her, and that this date is after September 13, 1981.

Initially, we note that in reviewing the denial of a judgment n.o.v., this Court must examine the evidence and all reasonable inferences therefrom in the light most favorable to the verdict winner. *Carrecter v. Colson Equipment Co.,* 346 Pa.Super. 95, 499 A.2d 326 (1985). Judgment n.o.v. will not be entered unless "the facts are such that two reasonable persons could not fail to agree that the verdict was improper." *Dambacher by Dambacher v. Mallis,* 336 Pa.Super. 22, 33, 485 A.2d 408, 414 (1984) (citations omitted). Where the statute of limitations is at issue, the burden of proof falls on the plaintiff to demonstrate that the cause of action is not barred by the passage of time and that his or her failure to file the action in timely fashion is excusable.

To reiterate, Ms. Corbett was under the care of Dr. Weisband and his associates at ROPA from December 18, 1978, until August 6, 1981. During that time she was hospitalized on numerous occasions, the two most important of which, for purposes of this law suit, are December 18 through 24, 1978, and October 27 through December 5, 1980. During the December 1978 hospitalization, she was treated for an infection in the knee. During the autumn 1980 hospitalization, Dr. Weisband attempted to fuse her knee.

Ms. Corbett filed her action against Dr. Weisband and ROPA on September 13, 1983. She claims in her suit that Dr. Weisband: (1) failed to treat her osteomyelitis properly, (2) negligently performed an arthrodesis on her left knee, and (3) performed the arthrodesis on her left knee without her consent. As a result, she contends, Dr. Weisband inflicted an injury by prolonging and aggravating the infection in her left knee, thereby necessitating further surgical procedures on her knee, eventually leading to amputation. The symptoms of Ms. Corbett's injury inflicted by Dr. Weisband were primarily pain, and secondarily, limitation of motion in her knee.

■ Under the doctrine known as the "discovery rule," the statute of limitations does not begin to run "until the plaintiff has discovered his injury, or, in the exercise of reasonable diligence, should have discovered his injury." *Groover v. Riddle Memorial Hospital,* 357 Pa.Super. 420, 423, 516 A.2d 53, 55 (1986), *quoting Cathcart v. Keene Indus. Insulation,* 324 Pa.Super. 123, 135–36, 471 A.2d 493, 500 (1984). Our Supreme Court has held that "[a]n injury is done when the act heralding a possible tort inflicts a damage which is physically objective and ascertainable." *Groover,* 357 Pa.Super. at 428, 516 A.2d at 57, *quoting Ayers v. Morgan,* 397 Pa. 282, 290, 154 A.2d 788, 792 (1959). Therefore, in cases such as these the jury must determine at what point a patient, using reasonable diligence, should have become aware that an injury had been inflicted upon her, and measure two years from then to determine whether a claim is time-barred.

In medical malpractice actions, defendants have relied upon *DeMartino v. Albert Einstein Medical Center, Northern Division,* 313 Pa.Super. 492, 460 A.2d 295 (1983), and related cases in attacking plaintiffs' contentions that they should be excused from the statutory limitations period. *DeMartino* sets forth the standard against which a plaintiff's knowledge is measured: did the patient know, or should the patient through the exercise of reasonable diligence have known, of (1) her injury; (2) the operative cause

of her injury; and, (3) the causal relationship between her injury and the operative conduct? [8] In the case at bar, the trial court submitted the issue to the jury in a special interrogatory, as follows: "Is this suit by the plaintiff barred by the Statute of Limitations?" The jury answered "no." Further, "[i]s any conduct of [Drs. Weisband and Mogil] before October 1980 barred by the Statute of Limitations?" The jury answered "no." Thus, the only question we must address is whether there is any evidence to support the jury's conclusion that Ms. Corbett, having exercised reasonable diligence, was justified in not discovering her injury until after September 13, 1981, which was less than two years before she brought her suit against Dr. Weisband.

### a. Osteomyelitis

It is central to the analysis under the discovery rule that an injury must be "ascertainable." *Groover*, 357 Pa.Super. at 428, 516 A.2d at 57. In numerous visits to Dr. Weisband's office after the first procedure of which Ms. Corbett complains, treatment of the infection in December 1978, her condition was repeatedly assessed by Dr. Weisband as "stable." [9] Further, on March 6, 1980, fifteen months after the first hospitalization, Dr. Weisband wrote a letter to Ms. Corbett's attorney diagnosing her condition as pyoarthritis and osteoarthritis, without mentioning osteomyelitis. Finally, when Ms. Corbett first consulted Dr.

8. We are aware that at least two panels of this Court have expressed dissatisfaction with the *DeMartino* test in certain types of cases, particularly those actions involving creeping diseases. See *Cathcart v. Keene Indus. Insulation*, 324 Pa.Super. 123, 471 A.2d 493, 500 (1984), and *Larthey by Larthey v. Bland*, 367 Pa.Super. 67, 532 A.2d 456 (1987). We find it unnecessary to decide whether the less complicated *Cathcart* standard should be applied since this case has been tried, briefed and argued on appeal under the *DeMartino* standard.

9. During the visit of January 16, 1979, Dr. Weisband noted the osteomyelitis was "in a remissive state"; on February 3, 1979, Dr. Weisband found no evidence of infection; on July 2, 1979, Dr. Weisband assessed her condition as stable; on October 23, 1979, she was stable, again; on December 4, 1979, Dr. Weisband found her to be stable; and on February 12, 1980, Dr. Weisband found no evidence of a flare-up.

Greene, on September 8, 1981, he failed to detect the infection deep in her knee.[10] Therefore, there is ample evidence to support the jury's finding that Ms. Corbett was justified in not having discovered her injury, resulting from Dr. Weisband's failure to treat the osteomyelitis, prior to September 13, 1981.

### b. Arthrodesis

The second procedure of which Ms. Corbett complains, the arthrodesis or attempted knee fusion, occurred on October 31, 1980. Appellants argue that Ms. Corbett should have brought her action within two years of the procedure, or at the very latest, within two years of when she first learned from Dr. Greene that the fusion performed by Dr. Weisband "didn't take." Dr. Greene first examined her and spoke to her on September 8, 1981, so Dr. Weisband and ROPA contend that any action as to the arthrodesis is necessarily time-barred as of September 8, 1983, five days before her suit was filed.

We address the latter contention first. Dr. Weisband and ROPA contend that Ms. Corbett's lack of consent claim should have been time-barred as of September 8, 1983 because, they allege, Dr. Greene told her on September 8, 1981 that a fusion had been performed by Dr. Weisband and that it had failed. Since such a statement would have put her on notice that an unauthorized procedure had been carried out, they argue, judgment n.o.v. should have been granted. We disagree, and hold that the testimony of record is such that two reasonable minds could differ as to whether Ms. Corbett understood that an unauthorized medical procedure had been performed on her.

First, Dr. Greene's testimony is in conflict. He did not testify at trial. Rather, his videotape deposition was played for the jury and entered into the record on that basis. The deposition testimony which Dr. Weisband asserts shows that Ms. Corbett should have been put on notice that a

10. Dr. Greene specifically found a "lack of any infection in her knee joint." T.T., December 10, 1985 at 157.

fusion had been performed centered on a "note" which Dr. Greene recorded concerning Ms. Corbett's visit to him on September 8, 1981. In the course of the deposition Mr. Schell, who by this time was serving as counsel to Dr. Weisband and ROPA, asked Dr. Greene to read part of the note. The excerpt read by Dr. Greene indicated that a fusion had been performed in the past, and that it did not succeed. There is no indication of record that Ms. Corbett was given a copy of the note to read. However, Dr. Greene testified in the deposition that he "told her that the fusion didn't take." T.T., December 10, 1985 at 157. Importantly, later in the deposition, Dr. Greene was asked by Mr. Finney whether he recalled telling Ms. Corbett on September 8th that the prior operation had been an attempted fusion of the knee. Dr. Greene answered, "[n]o, I did not. There wouldn't have been any reason for me to say that to her." T.T., December 10, 1985 at 181. Thus, the two statements by Dr. Greene are in conflict.

■ Considering the above ambiguous testimony regarding Dr. Greene's statements to Ms. Corbett on September 8, 1981, along with testimony by Ms. Corbett that she was not told of the procedure and the recognition by all parties that no signed consent form for the arthrodesis is in existence, we hold that the testimony of record could support the jury's finding that Ms. Corbett did not know, and through the exercise of reasonable diligence could not have known, until after September 13, 1981, that a procedure which she had not authorized had been performed on her. Since reasonable minds could differ on this issue, the trial judge properly denied the motion for judgment n.o.v.

Next, we consider Dr. Weisband and ROPA's claim that Ms. Corbett knew or should have known within two years of October 31, 1980 that the arthrodesis had been negligently performed. In addressing this issue, it is important to place into perspective Ms. Corbett's condition, as perceived by her, when she initially came under Dr. Weisband's care in December 1978, and during the two years leading up to the procedure of October 31, 1980. To reiterate, she had

experienced chronic knee problems since the 1930's. The problems were serious enough that she was using a cane prior to 1978. After Dr. DeMoura performed surgery on her knee in July 1978, she experienced pain in the knee, it did not heal, and it became infected. During the autumn of 1978 she was again hospitalized for her knee condition. She testified, "I was in sort of like a daze because my leg was aggravating me so much until I didn't exactly know what was happening." T.T., December 2, 1985 at 19. She continued in therapy for several months "because my leg had been bothering me so much and I couldn't work and do nothing. I couldn't get around like I wanted to get around." *Id.* at 20–21.

Ms. Corbett testified that in early 1979, after the December 1978 procedure by Dr. Weisband, she had difficulty walking. Her leg was wrapped from her ankle to the middle of her thigh, and it "hurt a lot." She wore a brace, and walked with the aid of crutches and a cane. Dr. Weisband saw her as an outpatient on many occasions in 1979 and 1980. He testified that on January 16, 1979 Ms. Corbett complained of pain due to a grinding sensation in her left knee. On February 13, 1979 she complained that her knee was giving out. The doctor observed that she was walking with a limp, or a guarded gait, and he prescribed a brace.

On July 2, 1979 Ms. Corbett again complained of pain, although she was still using the brace. In Ms. Corbett's visit to the office on October 23, 1979 Dr. Weisband noted that the "[l]eft knee is unstable in all planes," and that it continued to give out despite the use of a brace. T.T., December 11, 1985 at 60.

Dr. Weisband testified that he believed in 1979 that a fusion could alleviate some of Ms. Corbett's pain. However, he told her such a procedure could not be done at this time because of medication she was taking to prevent blood clots. Instead, the doctor ordered "a much larger knee brace," called a Lennox Hill brace, for her. T.T., December 11, 1985 at 61.

In February 1980, Ms. Corbett complained of burning in her knee, despite the use of the Lennox Hill brace. On September 4, 1980, Ms. Corbett saw another ROPA associate, Dr. Mogil, and told him that she had severe pain in her knee and was unable to stand on it for more than three minutes. As of September 18, 1980, Ms. Corbett was no longer taking medication for blood thinner, so the ROPA doctors made preparations for her to be admitted to Metropolitan Hospital for an arthrodesis procedure. These preparations included the ordering of an expensive compression device for use in the arthrodesis procedure. The surgery was carried out on October 31, 1980.

▪ Given Ms. Corbett's lengthy prior history of discomfort, immobility and suffering involving her knee, we do not agree with Dr. Weisband and ROPA's contention that the jury was not justified in finding that Ms. Corbett could not have discovered prior to September 13, 1981 that the arthrodesis was negligently performed. To the contrary, the record indicates with startling clarity that Ms. Corbett's pain continued unabated throughout her treatment by Dr. Weisband and Dr. Greene. Therefore, the jury properly concluded that reasonable minds could differ on the issue of Ms. Corbett's knowledge of her injuries, i.e., Dr. Weisband's negligently performed arthrodesis, and the trial court properly denied the motion for judgment n.o.v.

▪ Where the appropriate standard of conduct required of a plaintiff for the protection of her interests is at issue, a determination thereof is properly left to the jury. *Petri v. Smith*, 307 Pa.Super. 261, 453 A.2d 342 (1982). In *Petri*, our Court held that the question of whether the causal relationship between the injuries sustained by plaintiff's son at childbirth and the delivering physician was knowable to the plaintiff prior to the running of the statute of limitations, was a jury question. *Id.* *Accord, Taylor v. Tukanowicz*, 290 Pa.Super. 581, 435 A.2d 181 (1981); *Irrera v. Southeastern Pennsylvania Transportation Authority*, 231 Pa.Super. 508, 331 A.2d 705 (1974). *See also, Smith v. Bell Telephone Company of Pennsylvania*, 397 Pa. 134,

153 A.2d 477 (1959) (Whether statute of limitations has run on a claim is usually a question of law for the judge, but where the issue involves a factual determination, i.e., what is a reasonable period, the determination is for the jury).

In conclusion, the trial court properly denied Dr. Weisband and ROPA's motion for judgment n.o.v. because the jury had adequate evidence on which to base its decision that Ms. Corbett was justified in not knowing, prior to September 13, 1981, of the injuries inflicted upon her by Dr. Weisband.

## 2. New Trial

### *a.*

In addition to arguing that the trial court should have granted judgment n.o.v., Dr. Weisband and ROPA alternatively argue that they should be granted a new trial because of various alleged trial errors. First, they contend that the trial court erred in failing to preclude the expert testimony of Drs. Meinhard, Spicehandler, and Greene.

■ We agree with the trial court that Drs. Spicehandler and Greene were properly permitted to testify. As the trial court noted, Dr. Spicehandler's report did not introduce any issues of which Dr. Weisband was not already aware. Trial court opinion at 32–33. We are unconvinced by Dr. Weisband's contention that he did not know until November 15, 1985, that he would have to prepare a defense in the area of infectious diseases. Moreover, we concur with the trial court that no prejudice arose from allowing Dr. Meinhard to interpret the X-ray films of Ms. Corbett. See trial court opinion at 33–34. With respect to Dr. Greene, he was identified in Plaintiff's Answers to Interrogatories.

### *b.*

■ Dr. Weisband and ROPA next contend that the trial court committed prejudicial error when it refused to grant a continuance, requested on November 22, 1985, which was sought because Mr. Gallo, one of Dr. Weisband's attorneys, had to appear in Federal Court. "The trial court is vested

with broad discretion in the determination of whether a request for a continuance should be granted, and an appellate court should not disturb such a decision unless an abuse of that discretion is apparent." *Walasavage v. Marinelli*, 334 Pa.Super. 396, 413, 483 A.2d 509, 518 (1984). We find no abuse of discretion.

The case cited by Dr. Weisband and ROPA in support of their showing of prejudice, *Westinghouse Elevator Co. v. Herron*, 514 Pa. 252, 523 A.2d 723 (1987) [coincidentally, a case involving Mr. Schell, who was the attorney trying the instant case, in place of his partner, Mr. Gallo], contains many factors not present here. In that case, our Supreme Court found:

> the record supports the findings that Mr. Schell could not have adequately reviewed the record in so short a time, that Mr. Schell was not present at any proceedings in this case prior to Mr. Byrne's illness; that Mr. Schell had no prior familiarity with the case and no hand in forming trial strategy; and that contrary interests of the other defendants compounded Mr. Schell's difficulties....

*Id.*, 514 Pa. at 260, 523 A.2d at 727–28. The record in the case at bar reveals that Mr. Schell had much greater familiarity with the instant matter, than he did in the *Westinghouse* case. As counsel to St. Joseph's Hospital and partner to Mr. Gallo, Mr. Schell had a familiarity with the case sufficient to justify the trial court's decision not to grant the continuance. Moreover, Dr. Weisband and ROPA have not demonstrated that they were prejudiced in any way by Mr. Schell's representation. Therefore, we will not disturb the trial court's decision not to grant the continuance.

### c.

Dr. Weisband and ROPA next argue that the trial court abused its discretion in ordering these cases consolidated for trial. "The decision to consolidate actions rests within the discretion of the trial court. In a proper case the court should consolidate separate actions to avoid multiplici-

ty of trials or hearings and to reduce the expense to the parties." *Lohmiller v. Weidenbaugh,* 302 Pa.Super. 174, 182, 448 A.2d 583, 587 (1982) (citations omitted); Pa.R.C.P. 213. Having reviewed the record, we find no abuse of discretion by the trial court.

### d.

■ The next allegation of error set forth by Dr. Weisband and ROPA is that the trial court erred in failing to charge the jury on Ms. Corbett's possible contributory negligence in leaving the hospital in December 1978. Counsel for defendants requested this point for charge at sidebar during the court's charge to the jury. The basis of the request was Dr. Weisband's claim that Ms. Corbett "discharged herself" from the hospital. The uncontradicted testimony of record is that Ms. Corbett was discharged by her physicians. Therefore, the trial court did not err in refusing to charge the jury on this point.

### e.

The next assignment of error is that the trial court failed to submit the defendant's proposed special interrogatories to the jury. We have reviewed the proposed special interrogatories of Dr. Weisband and ROPA, as well as those submitted by the trial court. Under the standard elucidated in *Willinger v. Mercy Catholic Medical Center of Southeastern Pennsylvania,* 482 Pa. 441, 393 A.2d 1188 (1978), we find that the trial court did not abuse its discretion in rejecting the proposed special interrogatories of Dr. Weisband and ROPA.

### 3. Pre–Verdict Interest

■ Dr. Weisband and ROPA finally contend that even if the trial court was correct in not entering judgment n.o.v. and they are not entitled to a new trial, the court erred in awarding delay damages without considering the criteria set forth in *Craig v. Magee Memorial Rehabilitation Center,* 512 Pa. 60, 515 A.2d 1350 (1986). In *Craig,* our Supreme Court recognized that defendants could be unfair-

ly penalized under Rule 238 for delays caused by plaintiffs. The Court suspended Rule 238 and held that claims for delay damages are to be presented by petition within five days of a jury verdict, with the respondent's answer due five days thereafter. At that point the trial court may hold a hearing to resolve any factual disputes. The Court enumerated factors which the trial court was to consider.

*Craig* was decided on October 8, 1986, and was given prospective effect only:

> Those parties whose cases are now in the appellate or post-trial process, *who have not asserted attacks on the Rule 238 aspect of the damage award,* may not now assert such challenges. However, in those cases where the issue has been preserved, the court before whom the case resides on or after this date is to resolve the issue in a manner consistent with this opinion.

*Id.,* 512 Pa. at 66, 515 A.2d at 1353 (emphasis added). In the case at bar, the jury rendered its verdict on liability on December 18, 1985, and determined the amount of damages the following day. Immediately thereupon, counsel for Ms. Corbett made an oral motion for pre-verdict interest from September 18, 1983, to December 19, 1985. Counsel for Dr. Weisband made no objection at that time. The trial court granted the motion and instructed *both* counsel to calculate the damages.

We have reviewed appellants' post-trial motions as well as their arguments before Judge Wright, and we do not find any timely objection to the Rule 238 damages as required by *Craig.* Therefore, we hold that Dr. Weisband and ROPA have waived the issue relating to the *Craig* factors.

C. *Appeal of Ms. Corbett, 1105 Philadelphia, 1987*

In her appeal in this case, Ms. Corbett contends that the trial court erred in ruling as a matter of law that she was not entitled to recover from Dr. Weisband and ROPA any of the damages related to the subsequent care given by Dr. Greene, including the amputation of her leg in July 1983. Therefore, she seeks a new trial limited to the damage

aspect of her case. Ms. Corbett relies upon the well-established Pennsylvania principle "that a tortfeasor whose negligence is the legal cause of injury to a plaintiff is also liable for additional injury caused by the unskillful treatment that the plaintiff receives from a physician whom the plaintiff, exercising ordinary care, has selected." *Lebesco v. Southeastern Pennsylvania Transportation Authority*, 251 Pa. Super. 415, 422, 380 A.2d 848, 852 (1977). *Accord, Embrey v. Borough of West Mifflin*, 257 Pa.Super. 168, 390 A.2d 765 (1978) and *Smialek v. Chrysler Motors Corp.*, 290 Pa.Super. 496, 434 A.2d 1253 (1981). *See also* Restatement (Second) of Torts § 457 and *Prosser & Keeton on Torts*, § 44 (5th ed. 1984), at 301 *et seq.* There is no dispute between the parties about this principle and Dr. Weisband and ROPA do not argue that it is not a correct statement of the law. They argue, however, that that principle is not applicable in this case for either one of two reasons.

First, Dr. Weisband and ROPA contend that Dr. Greene's subsequent conduct in treating Ms. Corbett was so highly extraordinary that his intervening act constituted a superseding cause which insulates Dr. Weisband and ROPA from liability for the consequences of Dr. Greene's conduct. In the alternative, Dr. Weisband and ROPA argue that the injury caused by Dr. Greene is clearly apportionable and therefore liability for those injuries may not be imposed upon them. The trial court agreed with the arguments of Dr. Weisband and ROPA and refused to submit to the jury the plaintiff's claim for the damages and injury that were the proximate result of Dr. Greene's negligent conduct. We have concluded that the trial court erred in this regard for the reason that the issue of a superseding cause on the record before us is a jury question. As to the issue concerning apportionment, the record before us does not provide a reasonable basis for apportionment by either the Court or the jury and therefore a new trial must be held.

### 1. Superseding Cause

At the trial on damages, Dr. Weisband and ROPA argued, and the trial court agreed, that Dr. Weisband is not

responsible, as a matter of law, for the damages suffered by Ms. Corbett after she came under the care of Dr. Greene because Dr. Greene's conduct was so "highly extraordinary" as to constitute a superseding cause of her subsequent injuries, i.e., aggravation and prolongation of her pain and the ultimate amputation of her leg. On appeal, Ms. Corbett essentially responds that although Dr. Weisband cannot, as a matter of law, be held responsible for damages flowing from a highly extraordinary act, i.e., a superseding cause, the question of whether an intervening act is "highly extraordinary" should properly be left to the jury, and the trial judge erred in making that determination and taking it from the jury under the facts of this case. The trial court held that the opinion testimony from every physician who commented on Dr. Greene's subsequent conduct—that a total knee replacement in a patient of Ms. Corbett's condition was highly unusual and constituted extraordinary negligence—was sufficient to remove the issue from the province of the jury. For the reasons which follow, we disagree with the trial court and award Ms. Corbett a new trial limited to the issue of damages.

An exception to the general rule that a tortfeasor is responsible for injuries arising from his or her negligence may be provided by an intervening act, however, if it constitutes a superseding cause. "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Restatement (Second) of Torts § 440. As Professors Prosser and Keeton have stated, "the problem is one of whether the defendant is to be held liable for an injury to which the defendant has in fact made a substantial contribution, when it is brought about by a later cause of independent origin, for which the defendant is not responsible." *Prosser & Keeton on Torts* § 44 (5th ed. 1984), at 301. The law as to negligent intervening acts is set forth in Restatement (Second) of Torts § 447, which has

been adopted in Pennsylvania.[11]   The section outlines the circumstances under which a negligent intervening act is *not* a superseding cause:

> The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if
>
> (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or
>
> (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or
>
> (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

Whether or not the intervening act of a third person is so highly extraordinary as to constitute a superseding cause is a jury question, as held by our Supreme Court in *Estate of Flickinger v. Ritsky*, 452 Pa. 69, 305 A.2d 40 (1973).   There the Court adopted Comment b to § 453 of the Restatement (Second) of Torts:

> If ... the negligent character of the third person's intervening act or the reasonable foreseeability of its being done is a factor in determining whether the intervening act relieves the actor from liability for his antecedent negligence, and *under the undisputed facts there is room for reasonable difference of opinion as to whether such act was negligent or foreseeable,* the question should be left to the jury.   (Emphasis added.)

This concept has been continuously reaffirmed in subsequent cases.   *See Ross v. Vereb*, 481 Pa. 446, 392 A.2d 1376 (1978) (whether victim's intervening act of running away from school children and into path of skidding car constitut-

---

11.   *See Estate of Flickinger v. Ritsky*, 452 Pa. 69, 74 n. 6, 305 A.2d 40, 43 n. 6 (1973); *see also Grainy v. Campbell*, 493 Pa. 88, 425 A.2d 379 (1981).

ed a superseding cause of harm was a matter for the jury's determination); *Thompson v. City of Philadelphia,* 320 Pa.Super. 124, 466 A.2d 1349 (1983) (whether City of Philadelphia, as first actor who installed guardrails, could have reasonably foreseen negligent operation by second actor truck driver who drove his rig through guardrail resulting in death to motorist, was a fact question for the jury); *Harvey v. Hansen,* 299 Pa.Super. 474, 445 A.2d 1228 (1982) (whether a reasonable person would find injured driver's conduct to have been highly extraordinary within the meaning of § 447 was a question for the jury); *Amabile v. Auto Kleen Car Wash,* 249 Pa.Super. 240, 376 A.2d 247 (1977) (whether vacuum pumps at car wash were negligently placed so as to expose injured party to unreasonable dangers was a question for the factfinder).

In each of the above-cited cases, the recurring concept is that "where reasonable minds could differ, resolution of such questions is properly left to the jury." *Estate of Flickinger v. Ritsky,* 452 Pa. 69, 76, 305 A.2d 40, 44 (1973). Thus, our task in the case at bar is to determine whether reasonable minds could differ on the question of whether Dr. Greene's decision to perform a total knee replacement in the absence of taking an adequate history was so highly extraordinary as to constitute a superseding cause which insulates Dr. Weisband and ROPA from liability for the harm resulting from Dr. Greene's care.

Dr. Weisband and ROPA argue that all of the testimony elicited at trial regarding Dr. Greene's conduct establishes that Dr. Greene acted in a highly extraordinary manner. They point to the following: First, responding to a hypothetical fact situation in which the questioner postulated that Dr. Greene *knew* of the existence of the chronic osteomyelitis (which he did not, due to his failure to take an adequate history), Dr. Meinhard testified that "it borders on insanity to go ahead and do a total knee [replacement]." He added that such a procedure "would not be good medical practice," and agreed that it could be characterized as gross negligence.

Second, Dr. John Sbarbaro, an expert witness for Dr. Weisband, testified, "I cannot conceive of how [Dr. Greene] could have missed the diagnosis of osteomyelitis." He added that the total knee replacement "was doomed to failure the day it was done because it was a totally and poorly conceived procedure." Third, Dr. Weisband testified that he would not have considered doing a total knee replacement on a patient with chronic osteomyelitis:

That would be the most inhumane thing you could do to a patient with this condition. ... [A]s soon as you put a foreign substance into a knee joint that has chronic osteomyelitis, it's going to flare up the chronic osteomyelitis, if not the day of the surgery, within a period of time. No sane orthopedic surgeon would ever do this without planning to amputate soon afterwards.

T.T., December 12, 1985 at 48–49. Finally, Dr. Weisband and ROPA point to deposition testimony of Dr. Greene, admitted at trial, in which he admits that he was completely unaware of any infection in Ms. Corbett's left knee prior to performing the total knee replacement.

■■■ The trial court held that the cumulative effect of the foregoing testimony was to establish as a matter of law that Dr. Greene had been grossly negligent in his treatment of Ms. Corbett and that reasonable minds could not differ. Trial court opinion at 20. "This lack of skill or want of care," said the trial court, "is so obvious as to be within the range of ordinary experience and comprehension of even non-professional persons." Trial court opinion at 21. We agree that the record establishes that, without question, Dr. Greene was negligent and that expert testimony is not necessary to establish that proposition as a fact. In fact, no one contends that Dr. Greene was not negligent. Whether or not he was negligent is not, however, the issue. The issue is whether his negligence was "highly extraordinary." About that question, reasonable minds could differ.

■■■ We hold, therefore, that the trial court erred, under the circumstances of this case, in reaching such a conclusion as a matter of law. First, the statements made under oath

by Drs. Meinhard, Sbarbaro, and Weisband characterizing the conduct of Dr. Greene as "border[ing] on insanity" and a thing that "no sane orthopedic surgeon would ever do" are, in effect, expressions of opinion as to the ultimate issue, i.e., whether Dr. Greene's conduct was highly extraordinary. Our Supreme Court recently noted:

> For over a century, we have consistently held that an expert's comment on the totality of the evidence, where the evidence is in conflict, improperly impinges upon the jury's exclusive province.

*Kozak v. Struth,* 515 Pa. 554, 559, 531 A.2d 420, 422 (1987). Therefore, although no objection was made to that testimony, it was inappropriate for the witnesses to express an opinion as to the ultimate issue, i.e., whether Dr. Greene's negligence rose to the level of being highly extraordinary. Dr. Greene testified that he was unaware of the osteomyelitis at the time he performed the total knee replacement. Whether or not such conduct was so extreme as to constitute a superseding cause was a question that should properly have been left to the jury.

Furthermore, "the court's function is *not to decide* issues of fact but merely to determine whether any such issues exist." *Taylor v. Tukanowicz,* 290 Pa.Super. 581, 586, 435 A.2d 181, 183 (1981), *quoted in Petri v. Smith,* 307 Pa.Super. 261, 268, 453 A.2d 342, 345 (1982) (emphasis added). The testimony upon which the trial court made its finding consisted primarily of opinion testimony, some of which was based on hypothetical "facts" not established of record. We hold that the jury should have had an opportunity to decide based on that evidence whether Dr. Greene's conduct was highly extraordinary. Therefore, the trial court erred in ruling as a matter of law that Dr. Weisband could not be liable for any damages sustained by Ms. Corbett following the commencement of care by Dr. Greene.

### 2. Apportionment

As an alternative basis for its ruling excluding from the jury's consideration damages for the injuries sustained by Ms. Corbett while under the care of Dr. Greene, the trial

court concluded that it could, as a matter of law, apportion the damages sustained by Ms. Corbett between Dr. Weisband and Dr. Greene. The trial court apparently concluded that because the acts of negligence of Dr. Weisband and Dr. Greene were "separate from each other in nature and/or time, the damages are accordingly apportionable." Trial court opinion at 18. Ms. Corbett argues on appeal that the trial court erred in so holding because (1) her injury was not capable of apportionment in this case and (2) even if it were, the actual apportionment should have been made by the jury under proper instructions from the trial court. Dr. Weisband argues that the question of apportionment is one solely for the trial court and under the facts of this case apportionment was proper. Our review of the record and consideration of the briefs have led us to the conclusion that the trial court erred based upon the record before it.

The principles governing the apportionment of damages between multiple tortfeasors are set forth in the Restatement (Second) of Torts § 433 A, Apportionment of Harm to Causes. That section provides that:

(1) Damages for harm are to be apportioned among two or more causes where

(a) there are distinct harms, or

(b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes.

Further, comment (i) to subsection (2) states:

Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division. Death is that kind of harm, since it is impossible, except upon a purely arbitrary basis for the purpose of accomplishing the result, to say that one man has caused half of it and another the rest. The same is true of a broken leg, or any single wound, or the destruction of a house by fire, or the sinking of a barge. Such harms can be apportioned, if it (sic) all, only upon the basis of a prior reduction in value of what has been destroyed. By

far the greater number of personal injuries, and of harms to tangible property, are thus normally single and indivisible. Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.

Applying these principles to the present case, it is clear that the question to be decided is whether there is a "reasonable basis for determining the contribution of" Dr. Weisband's conduct and Dr. Greene's conduct to the loss of Ms. Corbett's leg. Ms. Corbett's contention in this case is that each of the doctors, although at a different time and place, negligently performed certain surgical procedures on her leg, each procedure of which was a substantial factor in causing the eventual loss of the leg. Our review of the record in this case does not disclose any "reasonable basis for determining the contribution of" each of the two doctors to that loss. See *Prosser & Keeton on Torts*, § 52, Apportionment of Damages (5th ed. 1984).

The Pennsylvania Supreme Court recently had occasion to consider the principles set forth in § 433 A in the case of *Martin v. Owens–Corning Fiberglas Corp.*, 515 Pa. 377, 528 A.2d 947 (1987). The plaintiff in that case filed suit to recover damages for asbestosis and related diseases allegedly resulting from his being required to work in proximity with asbestos products manufactured by the defendants. Evidence was presented at trial that plaintiff's condition was the result of both asbestosis and emphysema caused by the plaintiff's long-time use of cigarettes. The trial court concluded that apportionment of the damages was appropriate and submitted the issue to the jury under proper instructions. On appeal the Supreme Court held that the evidence presented did not provide a basis for the jury's consideration of the issue of apportionment and the case was remanded to the trial court for a new trial limited to

the question of damages. The Court, after summarizing the testimony of the various medical experts who testified, noted that the jury had not been provided with any "guidance in determining the relative contributions of asbestos exposure and cigarette smoking to appellant's disability. In fact, two experts testified that such a determination was not possible." 515 Pa. at 384, 528 A.2d at 950. The Court went on to point out that

> [t]he causes of disability in this case do not lend themselves to separation by lay-persons on any reasonable basis.(4) Thus, common sense and common experience possessed by a jury do not serve as substitutes for expert guidance and it follows that any apportionment by the jury in this case was a result of speculation and conjecture and hence, improper.(5) 'Rough approximation' is no substitute for justice.
>
> (4) Compare, *McAllister v. Pennsylvania Railroad Co.,* [324 Pa. 65, 187 A. 415 (1936) ] (Medical testimony and other proofs made it possible for jury to arrive at a reasonable basis of apportionment), with *Capone v. Donovan,* 332 Pa.Super. 185, 480 A.2d 1249 (1984). (Apportionment on reasonable basis not possible where three physicians each failed to properly diagnose fracture of plaintiff's arm.)
>
> (5) *Rice v. Hill,* 315 Pa. 166, 173, 172 A. 289, 291–92 (1934). (A jury may not award damages based upon speculation or conjecture.)

*Id.* (footnote 6 omitted.) The case before us is in much the same posture. The evidence of record does not differentiate between the relative contributions of Dr. Weisband and Dr. Green to Ms. Corbett's loss of her leg. Any attempt, therefore, to apportion damages between the two doctors would of necessity be based upon speculation.

The most recent discussion of the subject of apportionment by this Court was in the case of *Glomb v. Glomb,* 366 Pa.Super. 206, 530 A.2d 1362 (1987). In that case the minor plaintiff had suffered brain damage, disfiguration, and certain physical disabilities at the hands of a baby-sitter. The

child's guardian instituted suit against the baby-sitter and the child's parents who, it was alleged, had been negligent in employing the baby-sitter on the occasion in question. The parents argued that the minor child's damages should be apportioned between them on the one hand and the baby-sitter on the other. The trial court rejected that argument and a verdict of $1.5 million dollars was returned in favor of the child against all of the defendants. On appeal, counsel for the parents again argued that the trial court had erred in failing to submit the question of apportionment to the jury. An *en banc* panel of this Court rejected that argument and affirmed the judgment. We held that the record was void of any "logical, reasonable, or practical" basis to aid the jury in apportioning the damages resulting from the parents' negligence. The Court emphasized that each case is unique and requires a "practical inquiry" that analyzes the special circumstances of each case. Our Court said,

> Although most single, personal injuries defy objective apportionment ... we should not allow one party to bear an entire liability if the particular facts of the case will support a reasonable alternative. On the other hand, we cannot allow an arbitrary apportionment merely to avoid imposition of entire liability. A Court should not limit the innocent plaintiff's ability to recover the full measure of damages unless the Court has some reasonable basis for doing so.

*Id.*, 366 Pa.Superior Ct. at 212, 530 A.2d at 1365. Again, in the case before us as in *Glomb*, there is no evidence in the record that would support a reasonable or rational determination by the factfinder of the percentage of Ms. Corbett's damages that are attributable to Dr. Weisband and that percentage attributable to Dr. Greene.

In sharp contrast to *Martin* and *Glomb* is the decision of this Court in *Embrey v. Borough of West Mifflin*, 257 Pa.Super. 168, 390 A.2d 765 (1978). In that case Mr. Embrey was injured in an automobile accident at an intersection. He was taken from the scene of the accident to a

hospital. Five days after the accident, while he was still in the hospital, Mr. Embrey died of pulmonary edema. Suits were filed against the motor vehicle defendants and the medical care providers. The suits were consolidated for trial and the question of apportionment of damages between the motor vehicle defendants and the medical care providers was submitted to the jury by the trial judge. The jury, in response to special interrogatories, awarded $5,000 in damages as a result of the automobile accident and more than $600,000 resulting from the medical malpractice.

On appeal in *Embrey*, the medical defendants contended that the trial court had erred in permitting apportionment and contended that the total judgment should be against all of the defendants equally. This Court rejected that argument and affirmed the trial court's ruling. We held that there existed in the record "[c]redible evidence, however, [which] clearly delineates the damages which were suffered as a result of [the motor vehicle] negligence and those which were suffered as a result of the medical malpractice which followed." *Id.*, 257 Pa.Superior Ct. at 177, 390 A.2d at 770. Our Court noted that among the evidence was the testimony of a doctor who expressed the opinion that the decedent's injuries sustained in the motor vehicle accident were not life threatening. He further expressed the opinion that the decedent, had he been given proper medical care, would have returned to work within three months of the date of the accident. The doctor testified that in his opinion the decedent's life could have been saved up until at least one hour prior to his actual death had proper medical attention and care been provided. This Court noted that the jury's decision, placing the responsibility for the decedent's death and a considerable amount of his pain and suffering on the medical provider defendants, was appropriate.

A similar result was obtained in *Smialek v. Chrysler Motors Corp.*, 290 Pa.Super. 496, 434 A.2d 1253 (1981) where this Court noted that one of the medical experts who testified had expressed an opinion "that the decedent probably would have survived the accident absent the [succeed-

ing] negligence of medical personnel...." *Id.*, 290 Pa.Superior Ct. at 509, 434 A.2d at 1260.[12] There is no similar evidence in the case before us.

The trial court and the appellees [Dr. Weisband and ROPA] rely primarily on the decisions of this Court in *Harka v. Nabati*, 337 Pa.Super. 617, 487 A.2d 432 (1985), *Capone v. Donovan*, 332 Pa.Super. 185, 480 A.2d 1249 (1984), *Voyles v. Corwin*, 295 Pa.Super. 126, 441 A.2d 381 (1982), and *Lasprogata v. Qualls*, 263 Pa.Super. 174, 397 A.2d 803 (1979). However, the issue before this Court in those four cases was entirely different from the issue before us in this case. All of those cases were before this Court to review the trial court's entry of summary judgment for one of multiple tortfeasors and determine the effect to be given a release executed and delivered by the plaintiff in each case to the released tortfeasor.

In *Harka, Voyles,* and *Lasprogata* the injured party had filed an action against one or more subsequent tortfeasors. In each case, the subsequent tortfeasor(s) sought to join the *initial* tortfeasor as an additional defendant. Moreover, in each case the initial tortfeasor, after having been joined, pled a release from the plaintiff. In each instance summary judgment was entered in favor of the released, initial tortfeasor. This Court, in each of those cases, concluded that the various tortfeasors were not *joint* tortfeasors and that at the ensuing trial against the subsequent tortfeasor(s) the injured party's damages should be apportioned to the extent to which they were capable of being divided. However, in none of those cases did the Court have before it, as it does here, a record containing evidence upon which a determination could be made concerning apportionment.

In *Capone* the situation before the Court was reversed but the issue similar in that the effect of a release given by the plaintiff was determinative. In *Capone* the case before this Court was that of the plaintiff who had been injured

12. *Wade v. S.J. Groves and Sons, Inc.*, 283 Pa.Super. 464, 424 A.2d 902 (1981), is a somewhat similar case in which a defense argument that plaintiff's property damages had been properly apportioned by the trial judge sitting as a chancellor in equity, was rejected by our Court.

against the *initial* tortfeasor. In that case it appeared that the plaintiff had earlier settled a claim against a *subsequent* tortfeasor and had given that tortfeasor a release. The initial tortfeasor pled the release given by the plaintiff to the subsequent tortfeasor. The trial court, upon request, entered summary judgment for the initial tortfeasor and dismissed plaintiff's claim. On appeal the summary judgment was reversed. This Court held that the various tortfeasors were joint tortfeasors and therefore the plaintiff's release given to the subsequent joint tortfeasor did not release the initial tortfeasor. The Court also concluded that the damages claimed could not be apportioned. Once again, however, there was no trial record before the Court from which a determination could be made regarding the apportionability of the plaintiff's damages. In other words, the issue in those cases was not the sufficiency of the evidence taken at trial to support a claim of apportionment but on the contrary, dealt with whether the various tortfeasors were joint or not and the effects of a release given by the plaintiff to one of them.

The trial court in this case, in determining that apportionment was proper and excluding all evidence pertaining to damages resulting from the treatment and care rendered by Dr. Greene, focused on the nature of Dr. Greene's conduct, describing it as "gross" negligence. The Court reviewed at some length the testimony of the various witnesses and the opinions regarding Dr. Greene's conduct. In this respect the trial court erred. The *primary* focus and inquiry in deciding the question of apportionment should not be on the nature of the various tortfeasors' conduct but rather on the injury and whether, when that injury is a single one, there is any rational basis in the evidence of record to aid the factfinder in deciding what portion of fault should be attributed to each of the contributing tortfeasors. This the trial court did not do.

For example, in *Martin v. Owens–Corning Fiberglas Corp., supra,* the basis of the defendant's liability was strict liability as a result of the production and distribution

of the various products containing asbestos. On the other hand, the plaintiff's conduct was alleged to be negligent. Importantly, our Supreme Court did not focus on the distinction between negligence versus strict liability in deciding whether apportionment was or was not appropriate. Rather, the focus was on the record evidence to determine whether there was any such evidence that would provide an adequate or reasonable basis for the jury to make a determination apportioning damages without merely speculating.

The same analysis is evident in *Glomb v. Glomb, supra.* The parents' conduct was described as being negligent. However, the baby-sitter's conduct was characterized as an intentional tort. This Court did not focus on the distinction between a negligent act on the one hand and an intentional, harm-producing act on the other. Instead, as in *Martin,* the focus was on the quality of the record evidence to determine whether or not once again an appropriate guideline had been presented to enable the jury to do any more than speculate in attempting to pro-rate or apportion the damages between the defendants.

■■■ The burden in the case at bar was on the defendants, Dr. Weisband and ROPA, to present evidence of such a nature that damages could be apportioned. *Martin v. Owens–Corning Fiberglas Corp., supra.* As already pointed out, there is no such evidence in the record before us. Therefore, it is necessary that the plaintiff be given an opportunity to present evidence regarding her subsequent injuries at the hands of Dr. Greene and the ultimate loss of her leg. Obviously, Dr. Weisband will be entitled, at that time, to present any evidence, if available, from which a jury could reasonably and rationally apportion the damages sustained between the various tortfeasors. In this regard we note that while it is true the initial determination as to whether apportionment is appropriate is to be made by the Court, that does not mean that the Court is then to make the actual apportionment. The cases are clear on this. On

the contrary, if the trial court concludes that there is sufficient evidence presented for the jury to make a reasonable determination apportioning damages, then the actual apportionment is to be left to the jury under appropriate circumstances. For these reasons we will reverse and remand for a new trial.

## 3. New Trial on Damages

■ Ms. Corbett also requests that a new trial, limited to damages, be awarded. "A new trial may be awarded solely on the issue of damages if (1) the issue of liability has been fairly determined, and (2) the question of damages is readily separable from the issue of liability." *McIntyre v. Clark,* 314 Pa.Super. 552, 461 A.2d 295 (1983). As previously noted, this trial was bifurcated, and the jury decided the issue of liability before any evidence regarding damages was presented. We have already found that liability in this case was fairly determined. In the trial court, the issues of liability and damages were argued to be "readily separable." Under these circumstances, a new trial on damages alone is appropriate. *Martin v. Owens–Corning Fiberglas Corp.,* 515 Pa. 377, 528 A.2d 947 (1987); *see also Troncatti v. Smereczniak,* 428 Pa. 7, 235 A.2d 345 (1967); *Ecksel v. Orleans Construction Company,* 360 Pa.Super. 119, 519 A.2d 1021 (1987).

## V. *Conclusion*

The appeals at Nos. 1107 and 1167 Philadelphia, 1987 are quashed. Judgment in the appeal at 1106 Philadelphia, 1987 is vacated and we remand for a new trial in Ms. Corbett's suit against Dr. DeMoura. Judgment in the appeal at 1105 Philadelphia, 1987 is vacated, and we remand for a new trial on damages only in Ms. Corbett's suit against Dr. Weisband and ROPA. Judgment in the appeal at 975 Philadelphia, 1987, insofar as it relates to liability only, is affirmed.